

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------------x

ESTELLE STAMM,

                            Plaintiff,

         -against-

NEW YORK CITY TRANSIT AUTHORITY (TA);
MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY (MABSTOA);
LAURENCE G. REUTER, TA PRESIDENT;
KATHERINE LAPP, TA EXECUTIVE DIRECTOR;
MILLARD SEAY, TA VICE PRESIDENT FOR BUSES;
MICHAEL LOMBARDI, TA VICE PRESIDENT FOR
SUBWAYS; JOHN GAITO and AUGUSTINE ANGBA
of the ADA COMPLIANCE UNIT of the TA,
all individually and in their official capacities,

                           Defendants.

-----------------------------------------------------------------------------x

**MEMORANDUM
AND ORDER**

04-CV-2163 (SLT)

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ FEB 7 2006 ★
TIME A.M. P.M.

**TOWNES, United States District Judge:**

     Plaintiff, Estelle Stamm, brings this action pursuant to 42 U.S.C. § 1983 ("section 1983"

or "§ 1983"); Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. §§ 12131,

12132, and 12148; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and New

York State and New York City Laws, alleging that the New York City Transit Authority ("TA"),

the Manhattan and Bronx Surface Transit Operating Authority ("MABSTOA"), and six

employees of the TA (collectively, the "Individual Defendants") discriminated against her by

denying her "equal access to . . . buses and subways." Amended Complaint ("Am. Complt.") at

1. Defendants now bring this motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss (1)

plaintiff's claims pursuant to § 1983; (2) those claims which allege the violation of regulations

issued pursuant to the [ADA] and the Rehabilitation Act; (3) those claims against the Individual

Defendants which are premised on a violation of the New York State Human Rights Law and the

New York City Human Rights Code; (4) plaintiff's claims against the TA and MABSTOA pursuant to New York City Human Rights Law; and (5) plaintiff's State tort claims. For the reasons set forth below, defendants' motion are granted in part and denied in part.

## BACKGROUND

Plaintiff is a resident of New York City who allegedly suffers from two "disabilities which are not visible": Post-Traumatic Stress Disorder ("PTSD") and a hearing impairment. Am. Complt. at 1 and 3. In order to cope with these disabilities, plaintiff relies on a "trained service dog" which accompanies her whenever she goes out. Am. Complt. ¶ 30. Plaintiff also regularly relies on bus and subway services provided by the TA and MABSTOA, which ordinarily do not permit dogs on their vehicles.

Because plaintiff's disabilities are invisible, plaintiff has been questioned by bus drivers and subway conductors who suspect her of violating the TA's no-dog policy. Upon being informed by plaintiff that the dog is a service animal, some of the drivers and conductors have demanded identification, a license, dog tags, or other proof of the dog's special status. Believing that these inquiries and demands for identification are improper, plaintiff filed this action for injunctive relief and compensatory and punitive damages.

Plaintiff's Amended Complaint

Although plaintiff's Amended Complaint specifically describes 43 occasions on which plaintiff's right to ride public transportation with her dog was questioned by MABSTOA and/or TA employees between November 1998 and June 2004, plaintiff's problems with defendants pre-date the first of these 43 incidents. According to the Amended Complaint, the truth of which is assumed for purposes of this motion to dismiss, in or before December 1997, plaintiff was

prevented "on a number of occasions" from using public transit while accompanied by her dog. Am. Complt. ¶ 35. As a result of the pre-1998 incidents – none of which serve as a basis for this action – plaintiff met with defendant Augustine Angba of the TA's ADA Compliance Office and TA counsel Mary McCorry and agreed to apply for a TA-issued identification card for her dog. *Id.* That identification card, numbered "#001," was issued to plaintiff by the TA in December 1997.

Following the issuance of that identification card, there were apparently no incidents between plaintiff and TA or MABSTOA employees until the November 1998 incident which constitutes the "First Incident" described in plaintiff's Amended Complaint. In that incident, plaintiff encountered a bus driver who did not recognize the identification and demanded that plaintiff leave the bus. When plaintiff refused, the driver "took the bus out of service and told the passengers that they would have to take the next bus that came." *Id.* at ¶ 41. Plaintiff, however, remained on the bus and summoned the police on her cell phone. When the police arrived, plaintiff showed both the officers and the bus driver "a copy of New York Civil Rights Law § 47b, protecting the rights of disabled persons to be accompanied by service dogs." *Id.* at ¶ 42. After a delay of some unspecified length, the driver agreed to take plaintiff to her destination.

Plaintiff called Angba to report this incident. Angba apologized, then put plaintiff in contact with Steve Nacco, a representative of the TA's Bus Customer Service Division. Nacco also apologized, and gave plaintiff his telephone number to call in case of further, similar problems. *Id.* at ¶ 43.

3

Thereafter, plaintiff filed a complaint with the New York State Attorney General's Office. In June 1999, partially as a result of plaintiff's complaint, the TA and MABSTOA agreed to revise their policies, allowing persons with disabilities "to bring service dogs onto subways and buses without requiring that the person and dog have a certification that the person was disabled or that the dog was a service animal." *Id.* at ¶ 44. Plaintiff did not use her identification card thereafter.

A second incident occurred on April 6, 2000, when a subway conductor attempted to prevent plaintiff from entering a subway train with her dog by "deliberately and repeatedly clos[ing] the door on her," even after being informed that the dog was a service dog. *Id.* at ¶ 45-46. Plaintiff, fearful that she and her dog would be trapped on opposite sides of closed doors and that the dog might be dragged by the train, blocked the door open with her foot and ultimately succeeded in boarding the train with her dog. The following day, plaintiff again contacted Angba, who promised to investigate the incident. Although Angba did investigate, the investigation took so long that union rules precluded taking any disciplinary action against the conductor. *Id.* at ¶ 49.

A third incident occurred on August 18, 2000, after plaintiff had successfully entered a bus with her dog. As plaintiff was walking to the rear of the bus, the driver told her she had to sit up front. When plaintiff refused, the driver parked the bus and told the other passengers that the bus "could be on its way if [plaintiff] would comply." *Id.* at ¶ 56. Although other passengers became verbally abusive to her, plaintiff nonetheless refused to comply and the driver eventually took the bus out of service. After an unspecified delay, a bus dispatcher intervened and directed the driver to take plaintiff directly to her destination.

4

A similar incident took place on February 2, 2001, when a bus driver demanded that plaintiff show identification for her dog. Plaintiff told the driver she was no longer required to do so, and asked the driver to call "Console" – "the radio contact point for bus management at the TA" – to confirm this. *Id.* at ¶¶ 61-62. As in the third incident, *ante*, the driver initially told the passengers that it was plaintiff's fault that the bus was not proceeding, inciting other passengers to verbally abuse and threaten plaintiff. When plaintiff informed the driver of the threats and asked her to call the police, the driver took the bus out of service and did not call either the police or Console. Plaintiff then called Nacco, who had Console instruct the driver to take plaintiff to her destination. The driver did so, but was rude to plaintiff during the ride.

On February 5 and 9, 2001, bus drivers again asked plaintiff to show identification for her dog. On both occasions, plaintiff informed the driver that identification was no longer required and asked the driver to confirm this by calling "Console." Neither driver contacted Console, but both drivers permitted plaintiff to remain on the bus with her dog.

On February 15, 2001, plaintiff sent a detailed description of the three February incidents to defendant Millard Seay, the TA's Senior Vice President for Buses. Seay responded by indicating that the TA had disciplined the driver involved in the February 2 incident, and was "entering a re-instruction in the personnel records of the other two employees." *Id.* at ¶ 84. In addition, Seay stated that the TA "was planning to develop an advertising campaign, to appear on subways and buses, to remind its employees . . . of the rights of people with disabilities, including the use of service animals," and intended to repeat this campaign periodically. *Id.*

At some unspecified point after plaintiff's correspondence with Seay, the TA produced a "public service announcement" of the sort described by Seay. Plaintiff does not fault the

substance of the "campaign," but complains that it lasted only "a few months," and that the announcement "was seen infrequently on public transportation." *Id.* at ¶ 85.

On May 21, 2001, plaintiff was involved in another incident after taking her dog onto a subway train around 5 p.m. Instead of closing the doors behind her, the subway conductor emerged from his or her booth and threatened to call the police if plaintiff refused to exit the train. When plaintiff informed him that her dog was a service animal, the conductor demanded to see identification showing that the dog was in fact a service animal. Although plaintiff refused to do so, the conductor nonetheless closed the doors and permitted the train to proceed. The conductor later reemerged from the booth again and "demanded to know what [plaintiff's] disability was, and what the dog did for her." *Id.* at ¶ 97. Plaintiff refused to disclose such information and instead asked the conductor to call the police. The conductor did not do so, but did not disturb plaintiff thereafter.

In the Fall of 2001, the TA issued a "brochure designed to inform its employees of the access rights of persons with disabilities." *Id.* at ¶ 86. However, plaintiff alleges that this brochure contained some legal errors. First, it stated that "therapy animals" could not be "service animals," and implied that animals providing assistance to persons with psychiatric disabilities could be excluded from public transportation. Second, the brochure encouraged TA employees to inquire what service was provided by animals accompanying persons without visible disabilities and to deny service to persons unable to provide a satisfactory explanation. Plaintiff alleges that "[t]his advice to TA employees violates New York Civil Rights Law § 47-b(2)," as well as the ADA and the Rehabilitation Act. *Id.* at ¶¶ 90-91.

Since the publication of this brochure, bus drivers, subway conductors and other TA personnel have questioned plaintiff's right to ride public transportation with her dog on

6

approximately 35 occasions. After being informed that the dog is a "service dog," these employees have almost invariably asked to see "identification," a "license," a "tag," or other documentation for plaintiff's dog. On all of these occasions, plaintiff has refused to produce her identification, and has usually told the driver to call "Console." On about 8 of these 35 occasions, the driver actually called Console, and plaintiff's ride was delayed for a few minutes until Console told the driver to proceed on his or her route. On two other occasions, plaintiff called Console herself after a driver took his bus out of service. *Id.* at ¶¶ 159-163; 241-255. On one of those two occasions, plaintiff waited for about 15 minutes before a dispatcher arrived and ordered the driver to continue his route. *Id.* at ¶ 255. Plaintiff does not allege that she was delayed more than 15 minutes on any other occasion. On about 18 of the 35 occasions, plaintiff's ride was not delayed at all.

On about 6 of the 35 occasions, drivers have either argued with plaintiff after she refused to show her identification or have become rude or belligerent. In addition, on two more occasions drivers have made comments to the other passengers, blaming plaintiff for delaying the bus. On those occasions, other passengers have subjected plaintiff to verbal abuse. However, plaintiff does not allege that any of these other passengers have ever physically assaulted her.

Plaintiff's Amended Complaint alleges only one instance since 1998 in which the plaintiff was prevented from riding public transportation. On that occasion, which took place on November 12, 2001, a bus driver allegedly closed the doors in plaintiff's face and indicated, by gestures, that dogs were not allowed on the bus. While plaintiff was attempting to explain through the closed doors that her dog was a service dog, the bus drove away. *Id.* at ¶¶ 102-04.

7

<u>The Instant Action</u>

In May 2004, plaintiff filed the instant action against the TA, MABSTOA, and six TA employees: TA President Laurence Retuer, TA Executive Director Katherine Lapp; TA Vice President for Buses, Millard Seay; TA Vice President for Subways, Michael Lombardi; and John Gaito and Augustine Angba of the TA's ADA Compliance Unit. In her Amended Complaint, filed July 17, 2004, plaintiff lists ten causes of action. The first two of these allege that "[t]he actions of TA and MABSTOA employees, detailed above, and the failure of the TA and MABSTOA to act to prevent the recurrent problems" encounted by plaintiff violate the Public Transportation and Public Services provisions of the ADA: 42 U.S.C. §§ 12148 and 12131, respectively. Am. Complt. at ¶¶ 275-80. The third and fourth causes of action allege that the TA and MABSTOA wilfully violated a Department of Transportation ("DOT") regulation, 49 C.F.R. § 37.3, and unspecified regulations promulgated by the Department of Justice ("DOJ"), all of which implement the provisions of the ADA. The fifth cause of action alleges that the TA and MABSTOA have violated the Rehabilitation Act of 1973, 29 U.S.C. § 794, by denying services to plaintiff. The sixth cause of action alleges that the TA, Gaito and Angba, as well as "other TA officials designated by the TA to evaluate TA  compliance with . . . DOT regulations," have violated 49 C.F.R. § 27.7 and other DOT regulations designed to implement provisions of the Rehabilitation Act.

The seventh cause of action is the only action specifically naming defendants Reuter, Lapp, Seay and Lombardi. Plaintiff alleges that these defendants, along with Gaito, Angba and the TA, are liable to plaintiff "pursuant to 42 U.S.C. § 1983 for the intentional violation of her constitutional rights." *Id.* at ¶ 311. This cause of action does not specify the "constitutional

8

rights" allegedly violated by defendants, but states that the Individual Defendants have "failed to properly train, supervise, and discipline transit employees with respect to the provision of services to persons with disabilities who use service animals," and that defendants TA and MABSTOA have "maintained a policy" of failing to properly train, supervise, and discipline their employees in this respect. *Id.* at ¶¶ 305-06.

The remaining three causes of action all allege violations of State or local laws. The eighth cause of action alleges that "Defendants have discriminated against [plaintiff], and have aided and abetted in discrimination against her, in violation of the New York State Human Rights Law and the New York State Civil Rights Law." *Id.* at ¶ 316. The ninth cause of action alleges that defendants have discriminated against, or aided and abetted in discrimination against, plaintiff in violation of the New York City Human Rights Code, New York City Administrative Code § 8-107. Finally, the tenth cause of action alleges that defendants and their employees have committed various State law torts.

Plaintiff principally seeks an injunction requiring, *inter alia*, that defendants immediately distribute instructions directing TA employees to permit persons who allege that "they are persons with a disability and that an animal accompanying them is a service animal" to board public transportation without further discussion concerning "the nature of a person's disability or the services provided by the service animal." *Id.* at ¶ 325(1). Plaintiff also seeks "a declaration that Defendants have violated plaintiff's federal and state constitutional, statutory, and regulatory rights, and rights secured by the New York City Administrative Code." *Id.* at ¶ 325(3). In addition, plaintiff seeks compensatory and punitive damages, as well as attorney's fees and costs. *Id.* at ¶ 325(4) and (5).

9

<u>Defendants' Motion to Dismiss</u>

Defendants now move to dismiss some, but not all, of the claims set forth in plaintiff's Amended Complaint. Three of the five points raised in defendants' motion relate, in whole or in part, to the § 1983 claims raised in plaintiff's seventh cause of action. First, defendants argue that the § 1983 claims against the Individual Defendants should be dismissed because plaintiff has not alleged a constitutional violation and that, in any event, the Individual Defendants are entitled to qualified immunity. Second, defendants assert that all claims against the Individual Defendants should be dismissed because these defendants were not personally involved in the alleged wrongdoing and because no notice of claim was filed with respect to any Individual Defendant. Third, defendants argue that the § 1983 claims against the TA and MABSTOA should be dismissed pursuant to *Monell v. Department of Social Servs.*, 436 U.S. 658 (1978), because plaintiff has not alleged that the wrongdoing was the result of a "policy" or "custom" of these defendants.

Defendants also seek to dismiss the third, fourth and sixth causes of action on the ground that these claims are based on regulations promulgated under the ADA and Rehabilitation Act, and therefore state no causes of action separate from those stated under those statutes themselves. Finally, defendants argue that the ninth cause of action should be dismissed as to the TA and MABSTOA on the basis of Public Authorities Law § 1266(8) and that plaintiff's tenth cause of action, alleging State torts, should be dismissed for failure to file the notice required by New York General Municipal Law §§ 50-e and 50-i.

## DISCUSSION

In considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all of the factual allegations in the complaint as true and must

10

draw all reasonable inferences in the plaintiff's favor. *See, e.g., Board of Educ. of Pawling Cent. Sch. Dist. v. Schutz*, 290 F.3d 476, 479 (2d Cir. 2002); *Jaghory v. New York State Dept. of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997). A court "may not dismiss a complaint unless ' it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle [the plaintiff] to relief.'" *Jaghory*, 131 F.3d at 329 (quoting *Hoover v. Ronwin*, 466 U.S. 558, 587 (1984) (Stevens, J., disssenting)).

<u>Plaintiff's § 1983 Claims</u>

Three of the five points raised in defendants' motion to dismiss relate to the § 1983 claim set forth in plaintiff's seventh cause of action. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993), *cert. denied*, 512 U.S. 1240 (1994). In order to maintain a § 1983 action, a plaintiff must allege that the conduct complained of was "committed by a person acting under color of state law" and "deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Although § 1983 provides a cause of action for violations of federal statutes as well as constitutional violations, *see Maine v. Thiboutot*, 448 U.S. 1, 4 (1980), plaintiff's § 1983 claim does not allege any statutory violations but alleges only that defendants have deprived plaintiff of her "right to due process of law."[1]

---

[1]Accordingly, this Court need not address the question of whether plaintiff can sue under § 1983 for violations of Title II of the ADA and/or Section 504 of the Rehabilitation Act. However, this Court notes that at least one court in this Circuit has held that a plaintiff cannot recover under § 1983 for violations of these statutes. *See Bartlett v. New York State Bd. of Law Examiners*, 970 F.Supp. 1094, 1144-45 (S.D.N.Y. 1997), *aff'd in part and vacated in part on other grounds*, 156 F.3d 321 (2d Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999). "A plaintiff alleging a violation of a federal statute will be permitted to sue under § 1983 unless

The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." As the Supreme Court noted in *Daniels v. Williams*, 474 U.S. 327 (1986), "this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Id.* at 331 (emphasis in original). Thus, "negligently inflicted harm is categorically beneath the threshold of constitutional due process." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

"The Due Process Clause guarantees more than fair process" (*i.e*, procedural due process). *Washington v. Glucksberg*, 521 U.S. 702, 719 (1997). It also guarantees substantive due process, "barring certain government actions regardless of the fairness of the procedures used to implement them." *Lewis*, 523 U.S. at 840 (quoting *Daniels*, 474 U.S. at 331). By barring these government actions, the Due Process Clause "serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels*, 474 U.S. at 331-32 (quoting *Murray's Les v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277 (1856)).

Although plaintiff's Amended Complaint alleges only a "due process" violation, plaintiff's response to defendants' motion to dismiss clarifies that plaintiff is alleging a violation

---

(1) 'the statute [does] not create enforceable rights, privileges, or immunities within the meaning of § 1983,' or (2) 'Congress has foreclosed such enforcement of the statute in the enactment itself.'" *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990) (quoting *Wright v. City of Roanoke Redevelopment & Housing Auth.*, 479 U.S. 418, 423 (1987)). Congress's intent to foreclose §1983 actions for the violation of certain statutes may be implied when "the statutes at issue themselves provide[ ] for private judicial remedies, thereby evidencing congressional intent to supplant the § 1983 remedy." *Wright*, 479 U.S. at 427. Accordingly, in *Bartlett*, Judge Sotomayor reasoned that, because "the ADA and the Rehabilitation Act provide 'sufficiently comprehensive' remedies for violations of plaintiff's rights," the plaintiff was foreclosed from recovering under § 1983 as well. *Bartlett*, 970 F.Supp. at 1145.

of substantive due process. Plaintiff's Memorandum of Law in Opposition to Defendant's Motion to Dismiss ("Plaintiff's Memorandum") at 6. "'[S]ubstantive due process' prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin v. California*, 342 U.S. 165, 172 (1952), or interferes with rights 'implicit in the concept of ordered liberty,' *Palko v. Connecticut*, 302 U.S. 319, 325-326 (1937)." *United States v. Salerno*, 481 U.S. 739, 746 (1987). In order to establish a substantive due process theory violation under the first theory, a plaintiff must demonstrate that the government action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Pena v. Deprisco*, 432 F.3d 98, 112 (2d Cir. 2005) (quoting *Lewis*, 523 U.S. at 847, n. 8.). To succeed under the second theory, a plaintiff must demonstrate a violation of an identified liberty or property interest protected by the Due Process Clause.

Plaintiff's Amended Complaint fails to allege conduct which was so egregious or outrageous as to constitute a violation of substantive due process. The drivers and subway conductors whose actions form the basis for this action apparently mistook plaintiff, who has no visible disabilities, for a passenger attempting to violate the TA's policy prohibiting non-disabled riders from bringing dogs onto TA vehicles. In an attempt to effectuate the no-dogs policy, they demanded proof of the dog's special status. In most instances, these employees accepted plaintiff's representations that identification was not required and that her dog was a service dog. In those relatively rare instances in which the employees acted on her suggestion that they contact Console, or waited for a supervisor, plaintiff's ride was delayed for a short time. However, plaintiff does not allege that she was ever excluded from public transportation, except on one instance in which a bus pulled away before plaintiff could explain that her dog was a service

13

dog.[2]

Indeed, the most egregious conduct in which the TA employees allegedly engaged was intentionally inciting passengers against plaintiff. However, that conduct resulted only in verbal abuse from the passengers, including threats of violence, but not in any actual physical violence. Threats alone "do not amount to violations of constitutional rights." *Malsh v. Austin*, 901 F.Supp. 757, 763 (S.D.N.Y. 1995). Therefore, "[a]llegations of verbal threats, without any physical injury or damage, do not state a claim under § 1983." *Dove v. City of New York*, No. 99 Civ. 3020 (DC), 2000 WL 342682, at *3 (S.D.N.Y. Mar. 30, 2000); *see Abecasis v. Mr. Chestnut*, No. 93 Civ. 4246, 1998 WL 151035, at *7 (S.D.N.Y. Mar. 31, 1998) ("use of racial or ethnic slurs or other verbal abuse does not, by itself, violate constitutional rights").

The government conduct alleged in this case stands in marked contrast to the truly egregious conduct involved in the cases cited in *United States v. Caceres*, 440 U.S. 741 (1979) – the case cited by plaintiff for the proposition that due process may be violated where the government violates its own regulations in a way that substantially harms a plaintiff who relied upon them. For example, in *Raley v. Ohio*, 360 U.S. 423, 437-38 (1959), the Supreme Court held that substantive due process "precluded the conviction of individuals for refusing to answer questions asked by a state investigating commission which itself had erroneously provided assurances . . . that the [individuals] had a privilege under state law to refuse to answer."

---

[2]Even if plaintiff had been excluded from public transportation, such exclusion would not have risen to the level of a substantive due process violation. *See Rodriguez-Sanchez v. Besner*, No. 04-392-KI, 2005 WL 878587, at *5 (D.Or. Apr. 13, 2005) (holding that, even if the defendant "intentionally excluded [the plaintiff] from public transit for a month," such deprivation would not "touch on a fundamental right or rise to the level of other substantive due process violations courts have found.")

*Caceres*, 440 U.S. at 753 n. 15. Similarly, in *Cox v. Louisiana*, 379 U.S. 559 (1965), the Supreme Court held due process prevented an individual from being "punished for demonstrating 'near' a courthouse where the highest police officials of the city had advised . . . demonstrators that they could meet where they did without violating the statutory proscription against demonstrations 'near' the courthouse." *Id.*

The government conduct in these cases, and the other cases cited by the *Caceres* Court, bears no similarity to the conduct of which plaintiff's complains. Plaintiff is not alleging that the defendants had her arrested or sought to prosecute her when she attempted to enter buses or subways in accordance with TA policies. To the contrary, she alleges that she was invariably permitted to ride the buses and subways with her dog, either without delay or with a delay of no more than 15 minutes.

Plaintiff's Amended Complaint also does not allege, or suggest, that plaintiff's property or liberty interests were violated. Since the Constitution itself does not create property rights, those rights must "stem from an independent source such as state law." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). As the Supreme Court has emphasized, "[t]he hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 (1982). Thus, the fact that a reasonable accommodation for a person with a disability is required by the ADA and Rehabilitation Act does not imply that the disabled person has a property right in that accommodation. *See Bartlett v. New York State Bd. of Law Examiners*, 970 F.Supp. 1094, 1142-44 (S.D.N.Y. 1997) (bar applicant's right under the ADA and Rehabilitation Act to have reasonable accommodations for her learning disability during bar exam did not amount to a

15

liberty or property interest protected by the Due Process Clause), *aff'd in part and vacated in part on other grounds*, 156 F.3d 321 (2d Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999).

In this case, plaintiff asserts that "[d]efendants' explicit announcement of a change in policy, and assurances to Plaintiff, gave her an expectation rising to a property interest . . . ." Plaintiff's Memorandum at 9. However, the only "change in policy" alleged in the Amended Complaint – the June 1999 decision by TA and MABSTOA to permit persons with disabilities "to bring service dogs onto subways and buses without requiring that the person and dog have a certification that the person was disabled or that the dog was a service animal," Am. Complt. at ¶ 44 – did not create any property interest. The June 1999 decision was not a State law or even a regulation, and did not purport to create any individual rights whatsoever. Rather, it embodied the sort of "reasonable accommodation" which was held not to create property or liberty interests in *Bartlett*.

This Court is equally unpersuaded by plaintiff's assertion that the defendants' conduct violated plaintiff's liberty interests. Plaintiff characterizes her "purchase of services" from the TA and MABSTOA as "an implied-in-fact contract," and asserts that "the right to contract is an element of personal liberty." Memorandum of Law in Support of Defendant's Motion to Dismiss ("Defendant's Memorandum") at 9. However, as plaintiff herself concedes, "[t]he mere fact of a contractual breach by a public entity will not rise to a due process violation." *Id.* at 10; *see also S & D Maintenance Co., Inc. v. Goldin*, 844 F.2d 962, 967 (2d Cir. 1988) (even breach of contract for government employment does not by itself constitute a deprivation of liberty). Plaintiff has not cited to any cases in which exclusion from public transportation was held to violate the rider's liberty interests, much less cases in which mere delays in providing services to a rider was

16

held to violate liberty interests. The only case cited by plaintiff – *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 450 (1985) – in which the Supreme Court found a violation of the Equal Protection Clause of the Fourteenth Amendment, is inapposite.[3]

Even assuming that plaintiff could allege a violation of her property or liberty interests, the allegations in plaintiff's Amended Complaint would not make out a substantive due process violation. Plaintiff does not allege that the TA employees who demanded to see identification or a license for plaintiff's dog were deliberately violating her rights. Rather, plaintiff implies that these employees were simply ignorant of the TA's policy. Since these employees did not deliberately violate plaintiff's rights, any harm she incurred as a result of their actions was "negligently inflicted" and therefore "categorically beneath the threshold of constitutional due process." *See Lewis*, 523 U.S. at 849.

Finally, even if plaintiff's allegations were sufficient to establish a substantive due process claim with respect to these TA employees, the allegations would be insufficient to establish liability on the part of the named defendants. "It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an

---

[3]The only case which this Court's independent research has uncovered which addresses liberty interests in a similar context is *United States v. Madison*, 744 F.Supp. 490 (S.D.N.Y. 1990), *rev'd*, 936 F.2d 90 (2d Cir. 1991). In that case, a defendant who had boarded a bus in a New York City bus terminal and was awaiting its departure for New Jersey was questioned by a police officer who had boarded the bus after him. In finding that the defendant had been "seized" for purposes of the Fourth Amendment, the Court stated that the defendant would have "subject[ed] himself to a significant restriction of his liberty interest in interstate travel had he taken it upon himself to leave the bus and spend another half hour in the Terminal." *Id.* at 496. Even assuming that the *Madison* Court was correct in suggesting that forcing a passenger to leave an interstate bus could violate the passenger's "liberty interest in interstate travel," plaintiff cannot allege a violation of her liberty interest on this theory. The buses at issue were city buses, not interstate buses, and plaintiff was only delayed, rather than forced to leave the bus.

17

award of damages under §1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting

*Moffitt v. Town of Brookfield*, 950 F.2d. 880, 885 (2d Cir. 1991)). Supervisory liability cannot

rest on *respondeat superior* or on "linkage in the ... chain of command." *Hernandez v. Keane*,

341 F.3d 137, 144 (2d Cir. 2003), *cert. denied*, ___U.S.___, 125 S.Ct. 971 (2005). In order to

establish supervisory liability, a plaintiff must show "(1) actual direct participation in the

constitutional violation, (2) failure to remedy a wrong after being informed through a report or

appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional

violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of

subordinates who committed a violation, or (5) failure to act on information indicating that

unconstitutional acts were occurring." *Id.* at 145 (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d

Cir. 1995)).

Plaintiff's Amended Complaint does not allege that the defendants directly

participated in the alleged constitutional violations. Indeed, the Amended Complaint contains no

specific allegations concerning defendants Reuter, Lapp and Lombardi, other than allegations

describing them as parties to the action. Moreover, although the Amended Complaint alleges

specific actions on the part of defendants Angba, Seay, and Gaito, these allegations do not

suggest that these defendants violated plaintiff's constitutional rights in any way.

Plaintiff's Amended Complaint also does not allege that the defendants failed to remedy

wrongs after being informed of them or otherwise failed to act on information that wrongs were

occurring. To the contrary, plaintiff's Amended Complaint alleges that Angba, Seay, and Gaito

took action – albeit sometimes belatedly – when plaintiff informed them of problems she

experienced. Angba responded to plaintiff's pre-1998 complaints by developing an identification

18

card for plaintiff's dog, a solution which proved satisfactory for almost a year. Amended Complaint at ¶ 35. When plaintiff alerted Angba to difficulties she experienced in using that card, Angba apologized and put plaintiff in contact Steve Nacco, who gave plaintiff his telephone number to call in case of further, similar problems. *Id.* at ¶ 43. When plaintiff called Angba again on April 6, 2000, to complain about an incident in which a subway conductor allegedly "deliberately and repeatedly closed the door on her," Angba investigated the incident, even though the investigation took so long that union rules precluded taking any disciplinary action against the conductor. *Id.* at ¶ 49. Similarly, when plaintiff sent Seay a detailed description of the three February 2001 incidents, he disciplined the drivers or took other corrective action. *Id.* at ¶ 84. Even Gaito, who initially delayed the investigation of plaintiff's April 2003 complaint, ultimately initiated a formal investigation on plaintiff's behalf. *Id.* at ¶ 137.

Plaintiff's Amended Complaint also does not allege that the defendants created a policy that sanctioned conduct amounting to a constitutional violation. Indeed, the only TA policy expressly identified by plaintiff is the policy allowing persons with disabilities "to bring service dogs onto subways and buses without requiring that the person and dog have a certification that the person was disabled or that the dog was a service animal." *Id.* at ¶ 44. Plaintiff, whose complaint prompted the adoption of this policy, is obviously not alleging that this policy is unconstitutional.

The Amended Complaint also does not specifically allege that any of the individual defendants were "grossly negligent" in supervising employees. To be sure, the fact that plaintiff has been asked for identification for her dog on numerous occasions suggeststhat someone at the TA or MABSTOA may have been negligent in training employees. However, even though the

Amended Complaint alleges that Reuter, Lapp, Seay and Lombardi were responsible for overseeing these training operations, nothing in plaintiff's pleading suggests that their liability is based on more than *respondeat superior* or "linkage in the ... chain of command." *Hernandez*, 341 F.3d at 144. Moreover, the fact that plaintiff has experienced only 43 incidents in the six and one-half years since the TA changed its policy with respect to requiring identifications for service dogs and their owners militates against a finding of "gross" negligence.

Because plaintiff's pleadings are insufficient to allege that plaintiff's property or liberty interests were deliberately violated by government conduct; that this government conduct was so egregious as to otherwise violate substantive due process; or that defendants were in any way liable for this egregious conduct, plaintiff's § 1983 claim is dismissed.[4]

Plaintiff's Causes of Action Premised on Regulatory Violations

Defendants also move to dismiss plaintiff's third, fourth and sixth causes of action, which allege violations of various regulations purportedly implementing provisions of the ADA and the Rehabilitation Act. Defendants principally rely on *Alexander v. Sandoval*, 532 U.S. 275 (2001), in which the Supreme Court held that there was no private right of action to enforce certain disparate-impact regulations promulgated under Title VI of the Civil Rights Act of 1964. Defendants argue that, because "[b]oth the Rehabilitation Act . . ., directly, and the . . . ADA . . . by reference to the Rehabilitation Act, § 794a, specify that '[t]he remedies, procedures, and rights set forth in Title VI of the Civil Rights Act of 1964 shall be available to any person aggrieved by

---

[4]In light of the foregoing, this Court does not reach defendant's arguments that plaintiff's §1983 claims against the TA and MABSTOA must also be dismissed pursuant to *Monell v. Department of Social Servs.*, 436 U.S. 658 (1978), or that the Individual Defendants enjoy Qualified Immunity.

any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 [for ADA, subchapter II] of this title,'" *Sandoval* requires dismissal of plaintiff's claims based on regulatory violations. *See* Defendant's Memorandum at 18.

As plaintiff correctly points out, this argument appears to be based on an overly broad reading of *Sandoval*. In *Sandoval*, non-English-speakers sought to enjoin an English-only policy of the Alabama Department of Public Safety on the ground that it violated regulations proscribing activities having a disparate impact on racial groups. However, the Supreme Court found that Congress, which has the sole authority to create a private right of action to enforce federal laws, had only created a private right of action to enforce the *intentional* discrimination provisions of Title VI. The *Sandoval* Court therefore held "that private parties may not invoke Title VI regulations to obtain redress for disparate-impact discrimination because Title VI itself prohibits only intentional discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, ___, 125 S.Ct. 1497, 1506 (2005).

*Sandoval* did not hold, or even imply, that there is no private right of action to enforce regulations implementing the provisions of the ADA or Rehabilitation Act. To the contrary, the *Sandoval* Court indicated that a plaintiff might be able to sue to enforce a regulation which merely applied or authoritatively construed a statute which itself could be enforced by a private right of action, stating:

> We do not doubt that regulations applying § 601's ban on intentional discrimination are covered by the cause of action to enforce that section. Such regulations, if valid and reasonable, authoritatively construe the statute itself . . . . A Congress that intends the statute to be enforced through a private right of action intends the authoritative interpretation of the statute to be so enforced as well.

*Sandoval*, 532 U.S. at 284 (citations omitted).

21

In her response to this argument, plaintiff implies that the regulations set forth in her third, fourth and sixth causes of action do no more than apply and interpret the provisions of Title II of the ADA and the Rehabilitation Act. Indeed, the statements of purpose contained within the DOT regulations identified in plaintiff's third and sixth causes of action provide considerable support for that argument. *See* 49 C.F.R. § 37.1 ("The purpose of this part [49 C.F.R. Part 37] is to implement the transportation and related provisions of title II and III" of the ADA); 49 C.F.R. §27.1 ("The purpose of this part [49 C.F.R. Part 27] is to carry out the intent of section 504 of the Rehabilitation Act"). Although plaintiff's sixth cause of action does not specifically identify the DOJ regulations referenced therein, defendants' papers do not provide any basis for finding that those regulations do anything more than apply or interpret provisions of the ADA and/or Rehabilitation Act. Accordingly, defendants' motion to dismiss plaintiff's third, fourth and sixth causes of action is denied.[5]

## Plaintiff's Causes of Action against Individual Defendants for violations of State and Local Laws

The Individual Defendants also move to dismiss plaintiff's claims against them under the New York State Human Rights Law ("NYHRL"), N.Y. Exec. L. § 290 *et seq.*, and the New York City Human Rights Code ("NYCHRC"), N.Y.C. Admin. Code § 8-101 *et seq.*, on the ground that they neither participated in, nor "aided and abetted," the discriminatory conduct.

The NYHRL imposes liability for discriminatory acts on "employers." Although the

---

[5]This Court notes that while defendants have not presented any basis for dismissing these causes of action, defendants' papers set forth a legal basis for consolidating various causes of action. As noted in the Defendant's Memorandum, the *Sandoval* Court stated that "it is meaningless to talk about a cause of action to enforce the regulations apart from the statute." *Sandoval*, 532 U.S. at 284. However, defendants' motion seeks only dismissal, rather than consolidation, of causes of action, and this Court declines to *sua sponte* consolidate causes of action at this juncture.

language of that statute "provides no clue to whether individual employees . . . may be sued under its provisions," the New York Court of Appeals has held that a "corporate employee, though he has a title as an officer and is the manager or supervisor of a corporate division, is not individually [liable] . . . under New York's Human Rights Law . . . , if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 660 (1984). While several courts from this Circuit have distinguished *Patrowich* by relying on an NYHRL provision which makes it a discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [the NYHRL]," N.Y. Exec. L. § 296(6), those Court have held only that "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the [NYHRL]." *Tomka v. Seiler*, 66 F.3d 1295, 1317 (2d Cir. 1995) (citing cases).

The wording of the provisions in the NYHRL and the NYCHRC regarding "aiding and abetting" are identical. *See DeWitt v. Lieberman*, 48 F.Supp.2d 280, 294 n. 10 (S.D.N.Y. 1999) (citing *Ettinger v. State Univ. of N.Y. College of Optometry*, 95 Civ. 9893 (RWS), 1998 WL 91089, at *9 (S.D.N.Y. Mar. 2, 1998)). Accordingly, courts in this Circuit have held that actual participation is also a prerequisite to individual liability under the NYCHRC. *See, e.g., Sowemimo v. D.O.A.R. Security, Inc.*, 43 F.Supp.2d 477, 487 (S.D.N.Y. 1999); *DeWitt*, 48 F.Supp.2d at 294 n. 10.

As discussed above, the facts alleged in plaintiff's Amended Complaint do not suggest that any of the Individual Defendants actually participated in the allegedly discriminatory conduct. Plaintiff's claims against these defendants based on the NYHRL (contained in

23

plaintiff's eighth cause of action) and the NYCHRL (plaintiff's ninth cause of action) are, therefore, dismissed.

## Plaintiff's Causes of Action under the New York City Human Rights Code

Next, defendants argue that plaintiff's ninth cause of action, alleging the violation of provisions of the New York City Human Rights Code, must be dismissed because a 2000 amendment to New York Public Authorities Law ("PAL") § 1266(8) specifically exempts the TA and MABSTOA from liability under the New York City Administrative Code. This argument appears to be based on defendants' unsubstantiated assumption that the amendment was designed to overturn *Levy v. City Commission on Human Rights*, 85 N.Y.2d 740, 628 N.Y.S.2d 245 (1995), which held that the New York City Transit Authority is subject to the jurisdiction of the New York City Commission on Human Rights. However, this same argument has already been rejected by several district courts in this Circuit. Defendants' motion is, therefore, denied.

Prior to being amended in 2000, PAL § 1266(8) provided, in pertinent part:

> [N]o municipality . . . shall have jurisdiction over any facilities of the authority [*i.e.*, the Metropolitan Transportation Authority] or any of its activities and operations. The local laws, resolutions, ordinances, rules and regulations of a municipality . . . , heretofore or hereafter adopted, conflicting with this title or any rule or regulation of the authority, shall not be applicable to the activities or operations of the authority, or the facilities of the authority, except such facilities that are devoted to purposes other than transportation or transit services.

In 1995, the New York Court of Appeals decided *Levy*, a gender discrimination case in which a former TA employee had been awarded relief by the New York City Commission on Human Rights ("the Commission"). The sole issue in *Levy* was whether the TA was subject to the jurisdiction of the Commission. In answering that question in the affirmative, the Court

24

expressly rejected the TA's argument that, because the TA "is an independent and autonomous public authority created by the Legislature," the Commission could "exercise jurisdiction over it only if the Legislature . . . expressly authorized such local regulation and control." *Levy*, 85 N.Y.2d at 744, 628 N.Y.S.2d at 247. The *Levy* Court noted that such public authorities are only "'independent and autonomous' to the extent that they should be free from requirements imposed on other State agencies that would interfere with the accomplishment of the public corporation's purpose." *Id.*, 85 N.Y.2d at 745, 628 N.Y.S.2d at 248. Noting that the TA's purpose was "to acquire and operate transit facilities," the Court found that compliance with prohibitions against employment discrimination would not interfere with the TA's function or purpose.

In addition, the *Levy* Court rejected "the contention that specific legislative authority is required for the Commission's oversight" of the TA. *Id.* The Court noted that the Administrative Code gave the Commission authority to investigate complaints that corporations had engaged in discrimination, and that the legislature had not stripped the Commission of that authority with respect to public authorities or public benefit corporations, such as the TA. The Court stated:

> The Legislature has expressly declined to restrict the scope of the City Commission's jurisdiction and authority (*see*, General Municipal Law § 239-s), and there is no provision in the Public Authorities Law which appears to preclude the City Commission's jurisdiction over the New York City Transit Authority (*compare*, *e.g.*, Public Authorities Law § 1307[7] [the Capital District Transportation Authority is not subject to the jurisdiction over local governments unless specifically provided]).

*Id.*

About five years after *Levy* was decided, the Legislature amended PAL § 1266(8) to state that the TA and its subsidiaries, like the Metropolitan Transportation Authority and its subsidiaries, were exempt from certain local laws. As amended, PAL § 1266(8) now reads, in pertinent part:

> [N]o municipality . . . shall have jurisdiction over any facilities of the authority and its subsidiaries, and New York city transit authority and its subsidiaries, or any of their activities and operations. The local laws, resolutions, ordinances, rules and regulations of a municipality or political subdivision, heretofore or hereafter adopted, conflicting with this title or any rule or regulation of the authority or its subsidiaries, or New York city transit authority and its subsidiaries, shall not be applicable to the activities or operations of the authority and its subsidiaries, and New York city transit authority, or the facilities of the authority and its subsidiaries, and New York city transit authority and its subsidiaries, except such facilities that are devoted to purposes other than transportation or transit services.

Defendants argue that this amendment prohibits local governments from exercising jurisdiction over the TA, much as PAL § 1307(7) prohibits local governments from exercising jurisdiction over the Capital District Transportation Authority. Defendants further assert that, in light of this amendment, the New York Court of Appeals "would almost certainly conclude" that the TA is no longer subject to the discrimination provisions of the New York City Administrative Code.

This same argument has already been rejected by at least two other courts in this Circuit. In *Everson v. New York City Transit Auth.*, 216 F.Supp.2d 71 (E.D.N.Y. 2002), Judge Glasser found "no reason to conclude that, despite the recent amendment to Section 1266(8), the New York Court of [A]ppeals would today decide that the NYCTA is exempt from the reach of the New York City Administrative Code." *Id.* at 81. Judge Glasser found that "the upshot of the holding in *Levy* is that Section 1266(8) will only exempt the NYCTA from the reach of local

laws which interfere with the accomplishment of the NYCTA's purpose." *Id.* at 80. Noting that "compliance with local human rights laws will not interfere with the NYCTA's purpose," *id.,* Judge Glasser concluded that the 2000 amendment to PAL § 1266(8) would not alter the *Levy* Court's analysis.

Similarly, in *Bogdan v. New York City Transit Auth.*, No. 02 Civ. 9587 (GEL), 2005 WL 1161812 (S.D.N.Y. May 17, 2005), Judge Lynch expressly rejected the TA's argument that the 2000 amendment of PAL § 1266(8) had the effect of overruling *Levy.* Judge Lynch noted that, while the amended statute provided that "no municipality . . . shall have jurisdiction" over the TA, this blanket prohibition appeared to be qualified by a subsequent provision which provided "that only local laws that 'conflict[ed]' with the Public Authorities Law should be inapplicable, and then, only as to 'facilities . . . devoted to . . . transportation and transit services." *Id.* at *5. Applying basic principles of statutory analysis, Judge Lynch reasoned that "the Legislature did not intend to prohibit the application of all local laws to the TA, but only of such laws that interfered with the accomplishment of its transportation purposes." *Id.*

Judge Lynch also noted that his interpretation of § 1266(8) was supported by both federal and state court precedents. Judge Lynch cited not only to *Everson*, but also to *Wahlstrom v. Metro-North Commuter R.R. Co.*, 89 F.Supp.2d 506, 527 n. 21 (S.D.N.Y. 2000), which expressly followed *Levy* in "holding that Metro-North is not exempt from the NYCHRL." In addition, Judge Lynch cited to two state court cases – *Huerta v. N.Y. City Transit Auth.*, 290 A.D.2d 33, 735 N.Y.S.2d 5 (1st Dept. 2003), and *Rios v. Metro. Transp. Auth.*, Index No. 13206/03, 2004 WL 309154 (Richmond Co. Sup. Ct. Dec. 22, 2004) – which held that the TA could be sued for violations of local law even after the amendment of § 1266(8). Judge Lynch noted that, "[i]n

sharp contrast, the TA cites no judicial authority holding that the May 2000 amendment to § 1266(8) exempts it from complying with the City's anti-discrimination law." *Bogdan*, 2005 WL 1161812, at *6.

In this case, unlike in *Bogdan*, the TA has cited to some cases. However, in the case on which defendants principally rely – *Robinson v. Metro-North Commuter R.R. Co.*, Nos. 94 Civ. 7374 (JSR), 95 Civ. 8594 (JSR), 1998 WL 17742 (S.D.N.Y. 1998) – the plaintiffs did not controvert the TA's assertion that § 1266(8) required the dismissal of those causes of action brought under the New York City Administrative Code. Although the *Robinson* Court stated that it did not "perceive any valid response" to this argument, *id.* at *10, it did not discuss *Levy* or otherwise indicate that it had fully analyzed the issue. As a result, at least one court in this Circuit has expressly declined to follow *Robinson*. *See Wahlstrom*, 89 F.Supp.2d at 527 n. 21.

The only other federal case cited by defendants is an unpublished opinion which merely notes that the New York City Commission on Human Rights ("NYCCHR") had issued a right to sue letter in an employment discrimination case "based on the fact that New York City does not have jurisdiction over the NYCTA." *Gethers v. New York City Transit Auth.*, No. 02 CV 4310 (ARR), slip op. at 3-4 (E.D.N.Y. Sept. 30, 2004). However, the *Gethers* opinion itself did not address this issue, and the NYCCHR decision reported in that opinion appears to have been based on the TA's representations concerning the effect of the 2000 amendments, rather than on judicial authorities or the NYCCHR's own evaluation of the changes to § 1266(8).

Accordingly, defendants' motion to dismiss plaintiff's ninth cause of action on the ground that PAL § 1266(8), as amended, exempts the TA and MABSTOA from liability under the New

York City Administrative Code is denied.[6]

<u>Plaintiff's State Tort Claims</u>

Finally, defendants move to dismiss plaintiff's tenth cause of action, containing various State tort claims, on the ground that plaintiff has not yet filed the notice of claim required by New York General Municipal Law §§ 50-e and 50-i. These sections require that plaintiffs asserting State tort claims against a municipal entity or its employees must (1) file a notice of claim within ninety days after the incident giving rise to the claim, and (2) commence the action within a year and ninety days from the date on which the cause of action accrues. While these provisions "have been strictly construed by both state and federal courts," *Rohman v. New York City Transit Auth.*, No. 97-CV-0231 (ILG), 1998 U.S. Dist. LEXIS 19367, at *24 (E.D.N.Y. Oct. 30, 1998), New York's General Municipal Law also provides a procedure by which a plaintiff can apply to the State court for leave to serve a late notice of appeal. N.Y. Gen. Mun. L. 50-e(5).

Plaintiff implicitly concedes that she has not filed the notice of claim required under §§ 50-e and 50-i. However, plaintiff also represents that she may yet seek leave to serve a late notice of appeal. This Court agrees with plaintiff that dismissal of her tort claims for failure to file this notice would be premature under these circumstances. Defendants' motion to dismiss the tenth count of the indictment is therefore denied at this time. Defendants may, however, renew this motion if plaintiff fails to obtain leave to file a late notice of claim.

---

[6]Defendants have not raised, and this Court has not addressed, the issue of whether the local laws on which the ninth cause of action is based "interfere with the accomplishment" of the TA's purpose, *Everson*, 216 F.Supp.2d at 80, or "conflict with the TA's status as an independent agency charged with . . . providing transportation services." *Bogdan*, 2005 WL 1161812, at *6.

## CONCLUSION

For the reasons set forth above, plaintiff's seventh cause of action, alleging a violation of

42 U.S.C. § 1983, is dismissed. Plaintiff's claims against defendants Reuter, Lapp, Seay,

Lombardi, Gaito and Angba pursuant to the NYHRL (contained in plaintiff's eighth cause of

action) and the NYCHRL (plaintiff's ninth cause of action) are also dismissed.

Defendants' motion to dismiss is denied in all other respects. However, defendants may

renew their motion to dismiss plaintiff's State tort claims (the tenth cause of action) if plaintiff

fails to obtain leave to file a late notice of claim pursuant to N.Y. Gen. Mun. L. 50-e(5).

**SO ORDERED.**


SANDRA L. TOWNES
United States District Judge

Dated: Brooklyn, New York
     January 31 , 2006