UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
ESTELLE STAMM,

                          Plaintiff,

           -against-                                    **MEMORANDUM AND ORDER**

NEW YORK CITY TRANSIT AUTHORITY (TA),                   04-CV-2163 (SLT) (JMA)
and MANHATTAN AND BRONX SURFACE
TRANSIT OPERATING AUTHORITY (MABSTOA),

                          Defendants.
------------------------------------------------------------------x
**TOWNES, United States District Judge:**

    Plaintiff, Estelle Stamm, brings this action pursuant to Title II of the Americans with

Disabilities Act (the "ADA"), 42 U.S.C. § 12131, *et seq*., Section 504 of the Rehabilitation Act

of 1973, 29 U.S.C. § 794, and New York State and New York City laws, alleging that the New

York City Transit Authority ("NYCTA") and the Manhattan and Bronx Surface Transit

Operating Authority ("MaBSTOA") (collectively, "Defendants") have failed to ensure that their

vehicles and facilities are accessible to her and other  persons with disabilities who utilize

service animals.   Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56,

arguing, *inter alia*, that Plaintiff (1) is not disabled, (2) is not entitled to use a "service animal,"

(3) is seeking to bring dogs which do not qualify as "service animals" onto Defendants' vehicles;

(4) has not made out a Title II claim and (5) cannot make out a claim for intentional infliction of

emotional distress.  For the reasons set forth below, Defendants' motion is granted in part and

denied in part.

## BACKGROUND

### Plaintiff's History of Mental Impairments

Plaintiff is a 65-year-old resident of New York City. She had a difficult childhood, and claims that she has been receiving treatment from psychiatrists, psychologists and other mental health professionals since age 18. Affidavit of Estelle Stamm in Opposition to Defendants' Motion for Summary Judgment ("Stamm Aff.") at ¶ 11. In December 1992, Plaintiff started seeing Dr. Sue A. Shapiro, a clinical psychologist, who diagnosed her with Post-traumatic Stress Disorder ("PTSD") and Major Depression.[5] Affidavit of Sue A. Shapiro, Ph.D., in Opposition to Defendants' Motion for Summary Judgment ("Shapiro Aff.") at ¶ 11. Three other mental health professionals have subsequently concurred with this diagnosis: Ronald Winchel, M.D., a psychopharmacologist who Plaintiff has been seeing since 1995, and two psychiatrists – Hugh Butts, M.D., and Spencer Eth, M.D. – who examined Plaintiff in connection with this litigation. *See* Affidavit of Ronald Winchel, M.D., in Opposition to Defendants' Motion for Summary Judgment ("Winchel Aff.") at ¶¶ 6, 10; Affidavit of Hugh Butts, M.D., in Opposition to Defendants' Motion for Summary Judgment ("Butts Aff.") at ¶ 5; Affidavit of Spencer Eth, M.D., in Opposition to Defendants' Motion for Summary Judgment ("Eth Aff.") at ¶ 5.

According to Plaintiff, her PTSD and clinical depression affected her both professionally and in her personal life. When she first began seeing Dr. Shapiro, she was working four days a week for a creative manager at Young & Rubicam, an advertising agency. Stamm Aff. at ¶ 26.

---

[5]Major Depression is also called major depressive disorder and clinical depression. *See* http://www.mayoclinic.com/health/depression/DS00175.

However, by mid-1994, she sensed that she "had become increasingly incapable of functioning at work." *Id*. at ¶ 27. Plaintiff states:

> I was severely depressed and extremely anxious. I was having problems remembering things. I was putting things in places and not knowing where I had placed them. My memory for names and events worsened. I was unable to focus for meaningful time periods. Tasks that had once taken me two hours to complete, were now taking four to six hours, and even then, my work product wasn't very good.

*Id*.

Plaintiff was permitted to reduce her schedule to three days a week, but continued to have difficulties at work. *Id*. In her affidavit, Plaintiff describes an increasing inability to interact with others:

> I gradually became less able to interact with co-workers. I often retreated to my office, shut the door, and avoided communication, notwithstanding the fact that interfacing with the creative department was an integral part of my job. I just wanted to be left alone. I began working fewer and fewer hours, unable to be around people, feeling incredibly sad and overwhelmed.

*Id*. at ¶ 28. Plaintiff continued to work until September 1996, but "did not want to talk to anyone, kept [her] door almost constantly closed, and merely moved papers around [her] desk" because she was "unable to concentrate." *Id*. at ¶ 31. Eventually, she felt she "had no choice but to leave the job" and resigned. *Id*.

Plaintiff has not returned to work since then, and asserts that it is "not possible" for her to do so, largely because she is unable to concentrate. *Id*. at ¶ 32. Plaintiff is able to do volunteer work as a "mediator and mentor" for Safe Horizon, a New York City victim assistance agency. *Id*. at ¶ 36; *see* http://www.safehorizon.org. However, Plaintiff claims that she is able to do this work because the mediation takes place in a "closed room" where she is able "to focus

3

completely," and because she can set her own schedule and cancel and re-schedule mediation sessions whenever she feels unable to function. *Id*. at ¶ 36.

Both Dr. Shapiro and Plaintiff's husband, Alling Woodruff, Jr., concur in Plaintiff's assessment of her ability to work. *See* Affidavit of Alling Woodruff, Jr., in Opposition to Defendants' Motion for Summary Judgment ("Woodruff Aff.") at ¶ 9; Shapiro Aff. at ¶ 25. Although Dr. Shapiro notes that Plaintiff's "cognitive abilities vary with the degree of depression she is experiencing" and her reactions to the medications she is taking, Shapiro Aff. at ¶ 25, Dr. Shapiro opines that:

> [Plaintiff] remains unable to work because her concentration and ability to focus is very inconsistent. She could not hold a job where she needs to consistently show up and be capable of paying attention to the here and now, paying attention to the people that she is with and focusing on the task at hand.

*Id*.

According to the affidavits submitted by Plaintiff and her husband, Plaintiff's PTSD and depression has also adversely affected Plaintiff's personal life. Plaintiff asserts that, around 1993, she became unable to "tolerate the thought of anything invasive," and "developed a terrible phobia about going to a doctor or dentist." Stamm Aff. at ¶ 40. Plaintiff claims that she "lost teeth" because of her inability to go to the dentist and because, at times, she was unable to "even bear sticking a toothbrush in [her] mouth to brush [her] teeth." *Id*. Plaintiff also stopped having sexual relations. *Id*. at ¶ 19; Woodruff Aff. at ¶ 9. According to Plaintiff's husband, Plaintiff "has a tremendous fear of anything near any body orifice" and "is no longer able to have sex." Woodruff Aff. at ¶ 9. Plaintiff has also became increasingly isolated in her personal life. Plaintiff states:

> By the mid-1990's, I had lost interest in personally interacting with
> almost everyone. My friends gradually became people that I don't
> have to see, people with whom I communicate, almost exclusively,
> by computer or by phone, individuals I have met on service dog
> and flock guardian dog lists and some very old friends. I primarily
> engage in electronic discussions because of my difficulty in
> speaking with people, either in person or over the telephone. If I
> did not have these electronic forums to give me an outlet for
> socialization, I would have almost no communication with anyone.

Stamm Aff. at ¶ 20.

Plaintiff claims that the symptoms of her PTSD are exacerbated by an idiopathic hearing

loss in her right ear, which impedes her ability to determine the direction or distance from which

a sound is coming. *Id*. at ¶ 43. However, an examination conducted in March 2007 by Dr. Alvin

Katz, a Board-Certified Otorhinolaryngologist found no evidence that Plaintiff was

"compromised in communicating or localizing sound." Report of Dr. Katz dated Mar. 26, 2007

(attached as Ex. GG to Affidavit of Bruce J. Turkle, Esq., in Opposition to Defendants' Motion

for Summary Judgment). Although Plaintiff represents that her hearing problem "makes

concentration even more difficult," Stamm Aff. at ¶ 44, Plaintiff does not contend that this

hearing loss rises to the level of a physical impairment.

### Plaintiff's Dogs

After she stopped working in September 1996, Plaintiff adopted a female Caucasian

Ovcharka – a type of flock guardian dog. Stamm Aff. at ¶¶ 46-47. Plaintiff initially intended to

keep the dog, which she named Mishka, as a pet. *Id*. at ¶ 46. However, a professional dog

trainer who worked with Plaintiff during the first month following the adoption suggested to

Plaintiff that she "should consider using her for therapy dog work." *Id*. at ¶ 48. At that time,

Plaintiff did not know the difference between a therapy dog and a service dog, and "mistakenly joined [an on-line] discussion list devoted" to the latter. *Id*. at ¶ 48.

Although no health professional had ever suggested that she use a service dog, Plaintiff "began noticing that some of [her] PTSD related symptoms subsided when Mishka was with [her]." *Id*. at ¶ 49. Plaintiff "desensitized Mishka to loud voices, to fighting, to people raising their hands to [Plaintiff]," and found that the dog's "calmness was very helpful to [her] in staying in the present and being able to ask for help." *Id*. at ¶ 51. In a posting Plaintiff placed on the internet in September 1999, Plaintiff explained the way in which her dog mitigated her symptoms as follows:

> I trained Mishka to mitigate my PTSD in a way that I discovered is not typical for others who use their [service dogs] for PTSD. I have hypervigilance (the boogey man is always ready to get me) as a result of biochemical changes caused by the original trauma. This hypervigilance makes me susceptible to 'flashbacks' – dissociative events in which one re-experiences the trauma. The flashbacks are caused by 'triggers' that remind one of the original trauma. Very unpleasant. These are the symptoms of my PTSD that have been the most difficult to treat with medication or psychotherapy. This is what Mishka has been trained to mitigate.
>
> I trained Mishka to ignore my triggers. They are everywhere in my urban environment – violence or the threat of violence – including shouting. With time and trust, my hypervigilance subsided and I am now able to assess situations in a non-hypervigilant state.

Defendants' Rule 56.1 Ex. 14, at ST05921. Plaintiff claims that, in this way, the dog "almost freed [her] of dissociating on the street." Stamm Aff. at ¶ 49.

Since discovering this use for Mishka in late 1996 or sometime in 1997, Plaintiff has regularly brought her dog with her onto buses and subways operated by Defendants. It has not always been the same dog. In late 2000 or early 2001, after Mishka developed arthritis and

"exhibited reactivity to other dogs," Plaintiff retired Mishka and acquired a male Belgian

Malinois, which she named Sam. *Id*. at ¶¶ 57, 59. According to Plaintiff, the Belgian Malinois

resembles the German Shepherd in size and appearance, and Sam was "as tall, if not taller than

Mishka." *Id*. Sam had four months of training before Plaintiff received him, including

"extensive obedience training" and "public access training and hearing training." *Id*. at ¶ 60.

Like Mishka, Sam was "trained to ignore things in the environment that [Plaintiff did] not

consider to be a threat." *Id*. at ¶ 54.

While Plaintiff considered Sam "extremely well trained," he developed allergies and

began "to react to things that moved." *Id*. at ¶ 60. Accordingly, Plaintiff retired Sam in January

2002, and took Mishka "out of retirement for limited purposes, to go to doctor's appointments

and mediations, being careful that she was not put in a position where she would be reactive to

other dogs." *Id*. at ¶¶ 66-67.

In March 2004, Plaintiff acquired a male Anatolian Shepherd puppy, which she named

Wargas. Beginning in late April 2004, Wargas received six-weeks of basic obedience and

service dog training from a professional trainer, Sue Alexander, who has a program "for training

service dogs for people with mental illness." *Id*. at ¶¶ 70-71. Wargas then returned to Plaintiff,

who trained him to work in the subways by taking him into the busy Union Square subway

station near her home. *Id*. at ¶¶ 71-72. After Plaintiff was injured in February 2005, she

returned Wargas to Alexander, who continued to train him until August 2005.

Plaintiff claims that, like Mishka and Sam, Wargas was trained not to react to the things

that triggered her PTSD. Defendants' Rule 56.1 Ex. 14, ST07538. However, in an on-line

posting dated November 27, 2006, Plaintiff claimed that Wargas was also trained to "alert

[Plaintiff] by pawing [her] leg" upon sensing that Plaintiff was "emotionally upset," and that this pawing "refocuses [her] and keeps [her] from dissociating." *Id*. Plaintiff's claim that Wargas's actions mitigate her symptoms finds support in a report submitted by Dr. Spencer Eth, a Professor and Vice Chairman of Psychiatry at New York Medical College, who performed a psychiatric evaluation of Plaintiff in 2007. In discussing the role of Plaintiff's dog, Dr. Eth stated:

> Wargas has assumed critical psychological tasks, which Ms. Stamm relies upon to help maintain her psychiatric stability. Wargas is exquisitely sensitive to changes in Ms. Stamm's level of anxiety, such that Wargas may become aware of escalating anxiety before Ms. Stamm herself can appreciate the change in her mental state. Consequently, Ms. Stamm is better able to control the disruptive effects of her psychological terror.

Eth Aff., Ex. B, at 5. Dr. Eth concluded that Wargas's actions "are specific and effective, and they target psychiatric symptoms that have long handicapped Ms. Stamm." *Id*.

### *The Initial Incidents involving Defendants*

At all times relevant to this action, the "Rules Governing The Conduct and Safety of the Public in the Use of the Facilities of New York City Transit Authority and Manhattan and Bronx Surface Transit Operating Authority" have expressly prohibited passengers from "bring[ing] any animal on or into any conveyance or facility unless enclosed in a container and carried in a manner which would not annoy other passengers." 21 N.Y.C.R.R. § 1050.9(h)(1). However, this prohibition "does not apply to working dogs for law enforcement agencies, to service animals or to animals which are being trained as service animals and are accompanying persons with disabilities, or to animals which are being trained as service animals by a professional trainer." *Id*. at § 1050(h)(2). The Rules define the term "service animal" as follows:

> [A] guide dog, signal dog, or other animal individually trained to
> perform tasks for the benefit of a person with a disability that such
> person is unable to perform due to such disability, such as guiding
> persons with impaired vision, alerting persons with impaired
> hearing to sounds, pulling a wheelchair, retrieving dropped items
> or providing rescue assistance.

21 N.Y.C.R.R. § 1050.2(c). Therapy animals and animals used for emotional support are expressly excluded from this definition. *Id*.

When Plaintiff first started riding public transportation with Mishka, a passenger using a service animal was required, upon request of "designated Authority Personnel," to "display a service animal license issued by the Department of Health of the City of New York or by other governmental agencies in New York or elsewhere authorized to issue such licenses, or an identification from a professional training school that the animal is a trained service animal." 21 N.Y.C.R.R. § 1050.9(h)(3) (1996). Passengers who did not have a service animal license or an identification from a professional training school could apply to the Metropolitan Transportation Authority for a service animal identification card. *Id*. at § 1050(h)(4). However, even if the animal had the requisite license or identification, designated authority personnel retained "the right to refuse admission to or eject any passenger accompanied by an animal which posed a direct threat to the safety of other passengers." *Id*. at § 1050(h)(5).

Prior to late 1997, Plaintiff did not have the required license or identification for Mishka and was prevented from boarding Defendants' vehicles with Mishka on several occasions. Amended Complaint at ¶ 35. Plaintiff "believed the Transit Authority's identification requirement violated the law," but she was ultimately persuaded by Augustine Angba, then the

NYCTA's Director for ADA Compliance, to apply for a service animal identification card. Stamm Aff. at ¶ 79. That identification card, numbered #001, was issued in December 1997.

While Plaintiff claims that this identification card "proved worthless," *id*. at ¶ 79, Plaintiff specifically recalls only a single instance in which one of Defendants' employees refused to recognize the card. In November 1998, Plaintiff encountered a bus driver who did not recognize the identification card and demanded that plaintiff leave the bus. When plaintiff refused, the driver "took the bus out of service and told the passengers that they would have to take the next bus that came." *Id.* at ¶ 80. Plaintiff summoned the police on her cell phone, then showed both the responding officers and the bus driver "a copy of New York Civil Rights Law § 47b, protecting the rights of disabled persons to be accompanied by service dogs." *Id* . After a delay of some unspecified length, the driver took Plaintiff to her destination. *Id*.

At some point thereafter, Plaintiff was furnished with telephone numbers for Steve Nacco, then the head of Defendants' Bus Customer Service Division, and "Console" – the Bus Command Center. It is not entirely clear when Plaintiff received these numbers or under what circumstances. In her Amended Complaint, Plaintiff alleged that Angba put her in contact with Nacco when she called to complain to Angba about the November 1998 incident, and that Nacco gave her his telephone number during the subsequent conversation. Amended Complaint at ¶ 43. However, in the affidavit submitted in opposition to Defendants' motion, Plaintiff implies that Angba gave her Nacco's telephone number only after "many years" of unsuccessfully attempting to address Plaintiff's problems. Stamm Aff. at ¶ 83. In any event, the record reflects that Plaintiff was provided with Console's telephone number no later than February 2001.

*The Change in NYCTA Policy*

In early 1999, Defendants suspended the policy of requiring identification for service animals. The decision not to require identification followed Defendants' receipt, in December 1998, of the Federal Transit Administration's "disposition in response to a complaint against New York City Transit" by one Dr. Nancy Jainchill. Defendants' Rule 56.1 Ex. 16. According to a letter written to NYCTA's President by Cheryl L. Hershey, the ADA Team Leader in the Office of Civil Rights, Dr. Jainchill had complained about the rule requiring "persons with disabilities who use the NYCT to produce proof that their service animals are registered prior to being allowed to use the NYCT transit services." *Id*. at 1. In response to this complaint, the Office of Civil Rights reviewed 21 N.Y.C.R.R. § 1050(h) and concluded that it violated the "intention" of the ADA statute and related regulations. *Id*. As the Office explained in its letter to the NYCTA's President:

> It is clear that the intent of the ADA statute and the DOT ADA regulations is to treat persons with disabilities equally and not to impose additional burdens to access the same rights and benefits available to others. Requiring a person with a disability to produce documentation that their service animal is registered is not consistent with the intention of the ADA Statute or the DOT ADA implementing regulations and the guidance provided by the Department of Justice.

*Id*. The letter concluded by directing the NYCTA's President to review the NYCTA's policy and to "advise [the Office] in writing within 30 days of the date of this letter of NYCT's plan to bring this policy in line with the requirements of the ADA statute and the DOT ADA regulations." *Id*.

The record does not indicate precisely what actions the NYCTA took in response to this letter. Although it is clear that the identification requirement was "suspended,"[6] it is unclear whether the NYCTA simultaneously adopted a policy of allowing passengers with animals unquestioned access to public transportation whenever the passenger asserted that they were accompanied by a service animal. There is some evidence that it may have. For example, at an ADA Compliance Coordination Committee meeting conducted on March 22, 1999, Angba first announced that the NYCTA had suspended its policy of requiring "that someone traveling with a service animal provide an ID if they are requested to do so either by a conductor, token booth

---

[6] 21 N.Y.C.R.R. § 1050.9(h)(3), the subsection which contained the identification requirement, was not formally amended until December 2005. Effective December 5, 2005, this subdivision was amended to provide:

> Upon request by a police officer or designated employee of the authority, a trainer must display proof of affiliation with a professional training school and that the animal is a licensed service animal or an animal being trained as a service animal. Upon request of a police officer or designated authority personnel, a passenger must provide evidence that an animal claimed to be a service animal and thus exempt from the provisions of paragraph (1) of this subdivision qualifies as such or is being trained as a service animal. Such evidence may be supplied through: the display of a service animal license issued by the Department of Health of the City of New York or by other governmental agencies in New York or elsewhere authorized to issue such licenses, the display of an identification from a professional training school that the animal is a trained service animal, the presence of a harness or a marking on a harness, or the credible verbal assurances of the person with a disability using the service animal or animal being trained as such. For purposes of this paragraph, credible verbal assurances may include a description of one or more tasks that the animal performs or is being trained to perform for the benefit of the person with a disability.

agent or a driver."  Declaration of Superintendent Samuel Forde in Support of the Defendants'

Motion for Summary Judgment ("Forde Dec."), Ex. 1 at D 1332A.  He then stated:

> Right now we still reserve the right to ask a customer whether the
> animal that they are traveling with is a pet.  If the customer says
> no, it is not a pet, it is a service animal, we have to allow them to
> use the system.

*Id*.

That same policy was reflected in the New Bus Operator Instruction Manual, which is

used during the initial training of bus operators.  According to John Acquaotta, a Superintendent

of Training and an instructor in the MTA New York City Transit Bus, MTA Bus and MTA Long

Island Bus Training Division Training School, these instructional manuals "are constantly

revised as they evolve along with the revisions and updates to the permanent bulletins which are

included within each manual."  Declaration of Superintendent John Acquaotta in Support of the

Defendants' Motion for Summary Judgment ("Acquaotta Declaration") at ¶ 8.  Although the

Acquaotta Declaration is dated August 21, 2008, the two examples of this manual which are

attached to that declaration both contain a Revised Permanent Bulletin dated March 5, 1999,

which states:

> **<u>Service Animals</u>**
> Customers with physical disabilities (visually impaired, hearing
> impaired, mobility impaired) may board any NYCT bus while
> accompanied by a service animal.  If a customer attempts to board
> your bus with an animal that does not appear to be a service
> animal, you are to inform the customer that '*No pets are allowed*.'
> **<u>However</u>**, if the customer informs you that the animal is a service
> dog or service animal, you must permit the customer to board with
> the animal.  The service animal may be permitted to board buses
> without identification.

Acquaotta Declaration, Ex. 1, at D 00676, and Ex 2, at D 1572 (emphasis in originals).[7]

The manuals do not provide any additional information regarding service animals or advice concerning how to distinguish them from pets, other than acknowledging that there are service animals other than "'Seeing Eye' Service Animals" and "'Hearing Guide' Service Animals," and suggesting that these "assist customers with any *physical* impairment and are usually recognized by their harness or tag." *Id*. (emphasis added). However, according to Acquaotta, a pamphlet entitled, "Service Animals at MTA New York City Transit" is also distributed during training. Acquaotta Declaration at ¶ 8. That pamphlet, a copy of which is attached as Exhibit 2 to the Forde Declaration, purports to contain "guidelines" to assist employees in making the "not always easy" distinction between service animals and pets. Yet, unlike the New Bus Operator Instruction Manual, the pamphlet does not mandate automatic acceptance of a passengers representations concerning their animal, but advises:

> Politely inform customers with animals that NYC Transit only allows pets on its property if the pets are enclosed in containers. ... If the customer says that the animal is a service animal, you may ask what assistance the animal provides. You might want to make an inquiry if the animal appears to be a pet, or the customer does not appear to be disabled. The customer should tell you what service the animal provides but does not have to make the animal demonstrate the service. Customers who do not tell you that it is a service animal or who will not tell you what assistance the animal provides must either place their pets in closed containers or leave the vehicle, station, or building.

---

[7]The Acquaotta Declaration makes no mention of a May 2007 revision to the instruction manual. However, the Affidavit of Bruce J. Turkle, Esq., in Opposition to Defendants' Motion for Summary Judgment ("Turkle Aff."), attaches a "Student Bus Operator Instruction Manual," which indicates that it was revised as of May 1, 2007. *Id*., Ex. JJ. This manual includes a Updated Permanent Bulletin dated October 25, 2004, which incorporates the procedure contained in the "Service Animals at MTA New York City Transit" pamphlet described on this page.

Forde Declaration, Ex. 2, at D 1339-40. The pamphlet also informs employees that they cannot "ask customers to show ID authorizing use of a service animal on NYC Transit" or "ask customers to specify their disabilities." *Id.* at D 1339.

Although it is unclear when this pamphlet was written, similar – but not identical – advice appears in bulletins dated May 2000 and July 2007. In the "New York City Transit Bulletin on Service Animals" dated May 2000, employees are directed to take the following steps when attempting to distinguish a service animal from a pet:

> You should initiate contact by notifying a customer with an animal that "no pets are allowed." If the customer states that it is a service animal required because of a disability, and you have some questions about the truthfulness of the statement, you may ask what task(s) the animal performs. **You may not require any identification** before granting access to customers with disabilities traveling with service animals. Persons with disabilities who prefer to obtain and present NYCT identification can do so on a voluntary basis, by contacting the ADA Compliance Office.
>
> If the customer cannot describe to you the tasks performed by the animal to provide some type of physical assistance to him or her, then the customer and accompanying animal may be excluded from the Transit facility, unless the animal is carried in a closed container. If the customer does indicate one or more tasks that the animal performs, you should permit access.

Forde Dec., Ex. 3, at D 00974 (emphasis in original). Similar directions appear in Bulletin No. 17-07, issued July 23, 2007, by the NYCTA's Division of Station Operations:

> To differentiate a service animal from a pet you should begin contact by notifying a customer with an animal that "NYC Transit only allows pets on its property if the pets are enclosed in containers." If the customer says that it is a service animal, the animal can ride with the person.
>
> **If the animal appears to be a pet, or the customer does not appear to be disabled you may ask what task(s) the animal performs. The customer should tell you what service the**

15

**animal provides.  You may not ask for a demonstration of that service, what the person's disability is, or for any identification.**

*       *       *

If the customer cannot describe to you the tasks performed by the animal to provide some sort of assistance to him or her, then the customer and accompanying animal may be excluded from the Transit Facility unless the animal is carried in a closed container.

Declaration of Senior Director Charles DeForte in Support of Defendants' Motion for Summary Judgment ("DeForte Declaration"), Ex. 1, at D 1481 (emphasis in original).

The above-quoted documents, as well as representations contained in the Acquaotta, DeForte, and Forde Declarations, indicate that Defendants made efforts to inform their employees of the policy changes instituted in early 1999.  However, Plaintiff has adduced evidence that at least some employees could not recall having ever been informed of the changes.  For example, Ernest Sanchez, who had been a bus operator for 18 years at the time he was deposed in May 2007, testified that he could not recall any announcements or publications relating to a change in Defendants' service animal policies.  Deposition of Ernest Sanchez, dated May 10, 2007 (Ex. P to Turkle Aff.), at 14.  Harry Caddell, a General Superintendent in charge of bus drivers, testified at his May 2007 deposition that he could not recall receiving any ADA-training in the preceding 10 years.  Deposition of Harry Caddell, dated May 14, 2007 (Ex. M to Turkle Aff.), at 25.  Similarly, Carl Bonsignore, a Superintendent of Transportation, testified that he did not "recall seeing" any guidance on service animals that assist individuals with mental disabilities.  Deposition of Carl Bonsignore, dated May 23, 2007 (Ex. N to Turkle Aff.), at 25.

### *Plaintiff's Experiences Following the NYCTA's Change in Policy*

In her affidavit, Plaintiff claims that since April 2000, she has been involved in over 50 incidents in which Defendants' employees were either ignorant of the change in policy or confused about which of the two apparently conflicting policies to apply.  Most of these

incidents are documented by letters Plaintiff wrote to Millard Seay, a Senior Vice President in the Department of Buses, or others at the MTA shortly after the incidents occurred. Some are also memorialized in tape recorded conversations between Console and individual bus operators.

For purposes of this opinion, it is unnecessary to describe each of these incidents. However, many of these involved what Plaintiff terms "access challenges," in which bus operators initially demanded identification. These occurred on a fairly regular basis, even years after the policy change. Moreover, the incidents repeatedly occurred on the same bus lines: the M14 and M15 bus lines, which traverse the neighborhood where Plaintiff lives. In most instances, the bus operators permitted Plaintiff to ride the bus when informed that identification was no longer required. Occasionally, though, bus operators took the bus out of service and specifically blamed Plaintiff, prompting a confrontation between other riders and Plaintiff.

The incidents which were memorialized in tape recordings are particularly revealing, in that they suggest that even personnel manning the Console were not familiar with the rules regarding service dogs. For example, in a conversation on March 14, 2003, Console informed a bus operator:

> The superintendent has already instructed me to tell you if she comes on the bus with a dog and it does not have any markings, if she states to you that it is a service dog, you must allow the woman on the bus with the dog."

Turkle Aff., Ex. DD. After further conversation, in which the bus driver requests assurances that he will not be disciplined if "anything happens, Console states:

> Well to be honest with you, I didn't know it was way [*sic*] myself, that's why they told me, they told me that if she comes on with a dog, you're allowed to state to the person that the dog has to be in a cage, that's your job, yes. If the person states to you that this is a service animal, they told me to tell you, you must let the person on.

*Id.*  In another instance, following an incident in which a bus operator discharged the passengers, Console advised the operator that "a service animal doesn't *always* require an ID."  Turkle Aff., Ex. BB, at 18 (emphasis added).  Following another incident in June 2004, the following conversation was recorded:

> Console: She won't show you the service animal permit, she won't show it?
>
> Operator: I asked her for ID and she didn't show me anything.
>
> Console: Alright, you know what, I have to leave it, and if she won't show it to you, it's gotta be your call.  Do you think it's safe to operate the bus with the dog there?
>
> Operator: It's a big dog, it's got a muzzle around him, I don't know what kind of dog it is.
>
> Console: With the muzzle, it's, it's better with the muzzle.  Hold on, let me ask . . . .
>
> Console: Did you ask the lady what the dog was for? She said it was a service animal?
>
> Operator: That's what she said.
>
> Console: Ok, let her ride, but ask her to please have the papers next time.

Turkle Aff., Ex. BB, at 1-2.

### The Procedural History of this Action

In May 2004, Plaintiff commenced this action by suing Defendants and six of their employees pursuant to 42 U.S.C. § 1983, Title II of the ADA,; Section 504 of the Rehabilitation Act of 1973, and New York State and New York City laws.  The defendants moved to dismiss on various grounds and, in a memorandum and order dated January 31, 2006, and entered February 7, 2006, this Court dismissed Plaintiff's § 1983 claim and dismissed the claims which Plaintiff

had brought against the individual defendants pursuant to State and City laws.  *See Stamm v. New York City Transit Auth.*, No. 04-CV-2163 (SLT), 2006 WL 1027142, at *17 (E.D.N.Y. Feb. 7, 2006).

In January 2008, Plaintiff filed a Second Amended Complaint, alleging that Defendants violated Title II of the ADA, Section 504 of the Rehabilitation Act of 1973, and New York State and New York City laws by failing "to ensure accessibility to persons with disabilities who use service animals."  Second Amended Complaint ("Complaint") at ¶ 1.  In this complaint, Plaintiff principally alleges:

> From late 1997, and continuing through the present, Plaintiff has been confronted on the bus and subway system by Defendants' employees on over fifty separate occasions.  Defendants' employees have sought to bar her from riding the bus or subway with her service animal and on numerous occasions have isolated Plaintiff from other passengers and have harassed, intimidated, and threatened, or caused others to threaten, Plaintiff.

*Id*. at ¶ 14.  The Complaint attributes these incidents to Defendants' failure to train the employees and to "rules, regulations and policies [which] explicitly encourage employees to second-guess assertions by persons who state that they are disabled and that the animal accompanying them is a service animal . . . ."  Complaint at ¶ 17.

The Complaint alleges eleven causes of action.  The first four causes of action and the seventh and eighth causes of action allege violations of the ADA.  The first two causes of action allege violations of the Public Service provisions (Part A) and the Public Transportation provisions (Part B) of Title II, respectively.  The third cause of action alleges violations of two Department of Transportation ("DOT") regulations implementing Part B: 49 C.F.R. § 37.173, which requires that public entities which operate a "fixed route" system (such as Defendants)

19

"ensure that personnel are trained to proficiency, as appropriate to their duties, so that they . . . properly assist and treat individuals with disabilities who use the service in a respectful and courteous way, with appropriate attention to the difference among individuals with disabilities," and "49 C.F.R. § 39.167(d)" – presumably, 49 C.F.R. § 37.167(d)) – which requires that public entities "permit service animals to accompany individuals with disabilities in vehicles and facilities."  Plaintiff's fourth cause of action alleges violations of Department of Justice ("DOJ") regulations which implement the Public Services provisions of Title II, but does not specify the regulations involved.

The seventh and eighth causes of action allege violations of 42 U.S.C. § 12203.  The seventh cause of action alleges that Defendants "retaliated against Plaintiff by denying Plaintiff[']s request for access to an articulated bus for purposes of acclimating her service animal to such type of vehicle" in violation of  42 U.S.C. § 12203(a).  The eighth cause of action alleges that Defendants and their employees have "illegally and improperly coerced, intimidated, threatened and interfered with Plaintiff's efforts to exercise and enjoy her rights under the ADA" in violation of 42 U.S.C. § 12203(b).

Four of the five remaining causes of action also allege disability discrimination, but specify violations of different statutes or regulations.  The fifth cause of action alleges violations of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, while the sixth cause of action alleges violations of regulations promulgated by the DOT with respect to this section.  The ninth and tenth causes of actions allege violations of New York State and New York City laws, respectively.

The eleventh and final cause of action alleges various state torts, stating:

> Defendants and their employees, by their intentional infliction of emotional distress, gross negligence, recklessness, and deliberate indifference have subjected Plaintiff to physical and emotional trauma, pain, and suffering.

Complaint at ¶ 66. The Complaint further alleges that Plaintiff has "given Defendants notice of her claims against them," but that Defendants failed to adjust the claims within thirty days. *Id*. at 67-68.

The Complaint seeks injunctive relief and a declaration that Defendants have violated Plaintiff's rights, as well as compensatory damages, punitive damages and reasonable attorneys' fees. With respect to injunctive relief, the Complaint seeks a mandatory injunction directing that Defendants' employees each be given "a statement instructing the employees that persons with disabilities, including persons with disabilities which are not visible, upon communicating that they are persons with disabilities and the animal accompanying them is a service animal, be permitted to board public transit." Complaint at ¶ 68(1). The Complaint also seeks to enjoin Defendants from "circulating, publishing, or enforcing regulations or Rules of Conduct which restrict the training or use of service animals in any manner not endangering passenger safety by persons with physical or mental disabilities . . . or which permit inquiry by Defendants' employees into the nature of a person's disability or the services provided by a service animal." *Id*.

### *Defendants' Motion for Summary Judgment*

Defendants now move for summary judgment pursuant to Fed. R. Civ. P. 56. Although the discussion portion of Defendants' Memorandum of Law in Support of their Motion for Summary Judgment ("Defendants" Memo") does not include any subheadings and is not "divided . . . into as many parts as there are points to be determined," Plaintiff has not argued that Defendants' Memo fails to satisfy the requirement of Local Civil Rule 7.1(a). Instead,

Plaintiff has adopted her own set of headings and subheadings, which point out, *inter alia*, arguments that Defendants made in the "Introduction" to their memorandum of law, but did not include in the "Discussion." *See* Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment ("Plaintiff's Memo") at 22 (Point III entitled, "Defendants Do Not Argue That Plaintiff's Retaliation Claims Should Be Dismissed.")

Rather than adopt Plaintiff's structure, this Court has carefully reviewed Defendants' Memo and has identified five arguments. First, Defendants argue that Plaintiff is not "disabled" for purposes of the ADA because she is not substantially impaired in any "major life activity." Second, Defendants argue that even if Plaintiff is impaired in one or more major life activities, Plaintiff has failed to establish a causal nexus between the limited major life activities and the accommodation she seeks. Third, Defendants argue that, even if Plaintiff is entitled to be accompanied by a "service animal" when she uses Defendants' vehicles and facilities, Plaintiff's dogs are not "service animals."

The fourth argument raised by Defendants relates to whether Plaintiff can recover for a violation of Title II. However, this argument appears to combine two points. First, Defendants argue that their employees' alleged misconduct is not frequent or serious enough to constitute a Title II violation. Second, Defendants assert that, even if Plaintiff can make out a Title II violation, the law does not permit recovery because there is no evidence that Defendants intentionally discriminated against Plaintiff on the basis of disability.

Defendants' fifth argument relates to one of the state-law torts listed in Plaintiff's eleventh cause of action. Specifically, Defendants argue that Plaintiff cannot establish intentional infliction of emotional distress because their employees' actions were not sufficiently

egregious.  Although Plaintiff's Memo suggests that Defendant may be making other arguments relating to state and local law, this Court does not read Defendants' Memo as raising any other claims.

## *DISCUSSION*

### *Standard of Review*

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see Celotex v. Catrett*, 477 U.S. 317, 322 (1986).  "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, *i.e*., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir.1999) (internal quotation marks omitted).

The moving party bears the burden of showing that there is no genuine issue of fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e)*; see Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotations and citations omitted).  Moreover, the disputed facts must be material to the issue in the case, in that they "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

When evaluating a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "No genuine issue exists if, on the basis of all the pleadings, affidavits and other papers on file, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, it appears that the evidence supporting the non-movant's case is so scant that a rational jury could not find in its favor." *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir.1996). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotation marks omitted) (alteration in original).

### Disability Under the ADA

Defendants' first argument is that plaintiff is not disabled for purposes of the ADA. The ADA defines the term "disability" to mean: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(1). Tacitly assuming that Plaintiff is proceeding under paragraph (A), Defendants argue that "Plaintiff's alleged impairments," which Defendants characterize as "a partial loss of hearing in one ear and post-traumatic stress disorder resulting from 'recovered memory' of childhood sexual abuse," do not substantially limit Plaintiff in any major life activities. Defendants' Memo at 10.

Although Defendants, by using the term "alleged impairment," make clear that they do not concede that Plaintiff has any physical or mental impairments, they do not expressly argue that Plaintiff has no impairments. Rather, Defendants argue that these alleged impairments, "manifested in occasional dissociation and hypervigilance, do not substantially limit her in the major life activities she has identified in her Complaints, much less in major life activities recognized in ADA case law. *Id*. at 11. Defendants argue that Plaintiff has maintained relationships with co-workers, friends and family, and is able to work, at least in a volunteer capacity. *Id*. at 12. Defendants further note that the "sporadic nature" of these mental impairments "counter her claim that they constitute 'substantial limitations.'" *Id*.

The ADA does not define "major life activities" or "substantial limit[ation]." *Ryan v. Grae & Rybicki*, 135 F.3d 867, 870 (2d Cir. 1998). However, the regulations promulgated by the Equal Employment Opportunity Commission ("EEOC") under the ADA do. *Id*. Even though these regulations are not binding, *id*., the Second Circuit accords "'great deference' to the EEOC's interpretation of the ADA, since it is charged with administering the statute." *Francis v. City of Meriden*, 129 F.3d 281, 283 n. 1 (2d Cir.1997).

These regulations define the term "substantially limits" to mean "(i) [u]nable to perform a major life activity that the average person in the general population can perform; or (ii) [s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). In addition, the regulations define "major life activities" as including "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing,

speaking, breathing, learning, and working." 29 C.F.R.§ 1630.2(i). However, "[a]s the use of the term 'such as' confirms, the list is illustrative, not exhaustive." *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998). The Second Circuit has identified other "major life activities," including, but not limited to, "sitting, standing, lifting, or reaching." *Ryan*, 135 F.3d at 870 (quoting EEOC, Americans with Disabilities Act Handbook I-27 (1992)).

In response to Defendants' first argument, Plaintiff alleges that she suffers from two mental impairments, Post-Traumatic Stress Disorder ("PTSD") and Major Depressive Disorder, which substantially limit her in five major life activities: traveling/commuting, working, interacting with others, taking care of herself, and engaging in sexual relations.[8] In their reply, Defendants do not contest that PTSD and Major Depression qualify as mental impairments or argue that Plaintiff does not have these conditions. Rather, Defendants specifically take issue with the contention that traveling/commuting is a "major life activity," assert that Plaintiff is actually working various volunteer jobs, and arue that Plaintiff is not substantially limited in her ability to interact with others because she has demonstrated an ability to communicate with NYCTA personnel. Defendants further argue that there is no "causal nexus" between the remaining two alleged "major life activities" and the accommodation Plaintiff seeks.

---

[8]Plaintiff does not allege that her partial hearing loss substantially limits her ability to perform a major life activity, but contends that this physical impairment increases her hyper-vigilance and exacerbates her PTSD. Plaintiff's Opposition at 5, n. 6.

*Traveling/Commuting*

The first issue this Court must consider is whether traveling and/or commuting was a "major life activity" at the times relevant to this action.[9]  Plaintiff asserts, without citing to any authority, that the "ability to travel, or, more particularly, to commute, is a major life activity." Plaintiff's Memo at 13.  Although Plaintiff further asserts that Defendants do not contest this point, *id.*, Defendants' Reply Memorandum of Law in Support of their Motion for Summary Judgment ("Reply Memo") argues that travel is not a major life activity and cites Second Circuit authority to this effect.  Reply Memo at 5.

The requirement that a plaintiff identify a major life activity that is affected by his or her impairment "plays an important role in ensuring that only significant impairments will enjoy the protection of the ADA."  *Reeves v. Johnson Controls World Servs.*, 140 F.3d 144, 152 (2d Cir. 1998).  Accordingly, in deciding whether a particular activity is "major life activity," courts "ask whether that activity is a significant one within the contemplation of the ADA, rather than whether that activity is important to a particular plaintiff."  *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 642 (2d Cir. 1998).  If the rule were otherwise, and a plaintiff was "able to define the major life activity as narrowly as possible, with an eye toward conforming the

_____

[9]The coverage of the ADA was expanded by the ADA Amendments Act of 2008, Pub. L. No. 110-325, 112 Stat. 3353 (2008), which became effective on January 1, 2009 – after the incidents that are the subject of this action.  Although many other Circuit Courts of Appeals have held that these amendments are not retroactive, *see Ragusa v. Malverne Union Free School Dist.*, 381 Fed. Appx. 85, 87 n. 2  (2d Cir. 2010) (summary order) (citing cases), the Second Circuit has yet to do so in a published opinion.  However, the Second Circuit has taken the position in at least two summary orders that these amendments are not retroactive.  *See Wega v. Center for Disability Rights Inc.*, 395 Fed. Appx. 782, 784 n. 1 (2d Cir. 2010) (summary order); *Ragusa*, 381 Fed. Appx. at 87 n. 2.  Accordingly, this Court will decide this case based on the law as it existed prior to the ADA Amendments Act.

definition to the particular facts of his own case," a plaintiff "could considerably lessen the burden of making an individualized showing of a substantial limitation." *Reeves*, 140 F.3d at 152.

*Reeves* was, in some respects, similar to the case at bar. *Reeves* involved an instance in which the plaintiff attempted to lessen his burden of showing a substantial limitation by tailoring the definition of the major life activity to fit the circumstances of his impairment. The plaintiff "hypothesize[d] a major life activity called 'everyday mobility,' which he then define[d] . . . largely by means of examples . . . coextensive with his symptoms." *Id.* As defined by the plaintiff, "everyday mobility," included "'taking vacations or even doing things as routine as going to a shopping mall alone,' . . . taking ground transportation 'along a route which might cause [one] to cross a bridge or tunnel or to travel on high roads,' . . . going to 'unfamiliar places that would involve staying overnight,' and riding 'unaccompanied in trains.' *Id.*

The Second Circuit rebuffed Reeves' attempt to create this narrowly tailored "major life activity." The Second Circuit stated:

> Where a plaintiff is sufficiently mobile to travel to and from work on a regular basis, but is unable to travel over bridges or through tunnels, to board trains unaccompanied, or to drive along routes prone to traffic tie-ups and over high roads, he has not alleged a limitation of the kind of 'everyday mobility' that might constitute a "major life activity" within the meaning of the ADA. Plaintiff does not, for example, claim that he was so immobile as a result of his mental impairment that he was unable to leave his house or to go to work. While we do not doubt that there are activities other than those listed in the EEOC regulations that are major life activities, see *Ryan*, 135 F.3d at 870[,] and while some activity more 'major' than plaintiff's definition of 'everyday mobility' may well constitute such, we are not persuaded that 'everyday mobility,' as narrowly defined by plaintiff in this case, is such a 'major life activity.'"

*Id.* at 153.

Other courts have interpreted *Reeves* as holding, or at least implying, that "travel" and particular types of travel are not "major life activities." For example, in *Coons v. Secretary of Treasury*, 383 F.3d 879 (9th Cir. 2004), the Ninth Circuit cited *Reeves* as authority for the proposition that "travel is *not* a major life activity." *Id.* at 885 (emphasis in original). Similarly, in *Colwell*, the Second Circuit quoted extensively from *Reeves* before holding that "driving" was not a major life activity. Relying on *Colwell*, the Second Circuit has indicated in an unpublished summary order that the "ability to commute long distances to work on a daily basis" is not a "major life activity." *See Montesano v. Principi*, 47 Fed. Appx. 608, 609 (2d Cir. 2002) (summary order). In addition, at least two district court in this Circuit have held that "[c]ommuting to work itself . . . is not recognized as a major life activity." *Darcy v. Lippman*, No. 03 CV 6898 (KMW)(DCF), 2008 WL 629999, at *15 (S.D.N.Y. Mar. 10, 2008) (citing *Menes v. CUNY University of New York*, 92 F. Supp. 2d 294, 303 (S.D.N.Y. 2000)).

In light of the foregoing, this Court concludes that neither travel nor commuting are, themselves, major life activities. Plaintiff has not cited to, and this Court's independent research has not uncovered, any authority from within this Circuit to the contrary. However, this Court recognizes that there appears to be an open question in this Circuit concerning whether commuting can be considered an element of the major life activity of working. See *Darcy v. Lippman*, 356 Fed. Appx. 434, 437 (2d Cir. 2009) (summary order) (declining to address this question). Indeed, the passage from *Reeves* which is quoted on pp. 28-29, *ante*, can be read as implying that a lack of mobility so severe as to prevent a plaintiff from traveling to work at all may be a substantial limitation on the major life activity of working.

### Working

There is no need for this Court to address this open question in this case, because neither party addresses the issue of whether Plaintiff's difficulties in traveling unaccompanied prevented her from working. Rather, Defendants argue that plaintiff is actually working: training three service dogs and participating in a wide range of volunteer activities, including serving as a mediator and a mentor for Safe Horizon, counseling sexual assault victims, and advising persons concerning service dogs. Defendants' Memo at 11. However, Plaintiff has adduced evidence that her volunteer activities are irregular and sporadic and that her depression prevents her from working a regular job. *See*, *e.g.*, Stamm Aff. at ¶¶ 24-32; Woodruff Aff. at ¶ 9; Shapiro Aff. at ¶ 25. Plaintiff's evidence is sufficient to create a genuine issue of material fact regarding whether Plaintiff's mental impairments substantially limit her ability to work.

### Interacting with Others

This Court also cannot grant summary judgment upon Defendants' argument that Plaintiff is not substantially limited in her ability to interact with others. This argument, contained in a footnote in Defendants' Reply Memo, is predicated on a narrow reading of *Jacques v. DiMarzio, Inc*., 386 F.3d 192 (2d Cir. 2004), which Defendants characterize as holding "that an ADA plaintiff is 'substantially limited' in 'interacting with others' when the mental . . . impairment severely limits "the fundamental ability to communicate with others." Reply Memo at 5 n. 10 (quoting *Jacques*, 386 F.3d at 203). Defendants reason that because Plaintiff "certainly communicates with NYCTA bus operators and conductors, among many other individuals," she is not substantially limited in her ability to interact with others. *Id*.

While Defendants have correctly quoted from *Jacques*, this single sentence does not capture the scope of what the Second Circuit meant by a "fundamental ability to communicate." Indeed, that single sentence is only part of a paragraph devoted to attempting to flesh out the meaning of that term. That paragraph states, in pertinent part:

> We hold that a plaintiff is "substantially limited" in "interacting with others" when the mental or physical impairment severely limits the fundamental ability to communicate with others. This standard is satisfied when the impairment severely limits the plaintiff's ability to connect with others, *i.e.,* to initiate contact with other people and respond to them, or to go among other people – at the most basic level of these activities. The standard is not satisfied by a plaintiff whose basic ability to communicate with others is not substantially limited but whose communication is inappropriate, ineffective, or unsuccessful. A plaintiff who otherwise can perform the functions of a job with (or without) reasonable accommodation could satisfy this standard by demonstrating isolation resulting from any of a number of severe conditions, including acute or profound cases of: autism, agoraphobia, depression or other conditions that we need not try to anticipate today.

*Jacques*, 386 F.3d at 203-04.

Plaintiff has adduced evidence that her depression resulted in the "isolation" mentioned in the final sentence of the above-quoted paragraph. For example, in describing the progression of events that caused her to leave her job in the creative department of Young & Rubicam in September 1996, Plaintiff states:

> I gradually became less able to interact with co-workers. I often retreated to my office, shut the door, and avoided communication, notwithstanding the fact that interfacing with the creative department was an integral part of my job. I just wanted to be left alone. I began working fewer and fewer hours, unable to be around people, feeling incredibly sad and overwhelmed.

Stamm Aff. at ¶ 28. Similarly, in describing her increasing isolation, Plaintiff states:

By the mid-1990's, I had lost interest in personally interacting with almost everyone. My friends gradually became people that I don't have to see, people with whom I communicate, almost exclusively, by computer or by phone, individuals I have met on service dog and flock guardian dog lists and some very old friends. I primarily engage in electronic discussions because of my difficulty in speaking with people, either in person or over the telephone. If I did not have these electronic forums to give me an outlet for socialization, I would have almost no communication with anyone.

*Id.* at ¶ 20.

These statements, if credited by the finder of fact, might be sufficient to make out the sort of isolation necessary to satisfy the "interacting with others" standard recognized by the Second Circuit in *Jacques*. Accordingly, this Court cannot find, based solely on evidence that Plaintiff was capable of occasional communication, that Plaintiff was not substantially limited in her ability to interact with others.

### *Causal Nexus*

Defendants make no attempt to argue that Plaintiff is not substantially limited in her ability to take care of herself or to engage in sexual relations, both of which are undoubtedly major life activities. *See* 29 C.F.R. § 1630.2(i) (defining "major life activities" as including "functions such as caring for oneself "); *Bragdon*, 524 U.S. at 638 ("Reproduction and the sexual dynamics surrounding it" are major life activities). Rather, Defendants argue that because "the ADA requires a nexus, a causal link, between the disabling condition and the accommodation sought," Defendants' Memo at 13, and "[b]ecause what plaintiff wants from NYCTA is not causally connected to any recognized 'major life activity' in which she may be (by virtue of some mental or physical condition) substantially limited, liability against NYCTA cannot be established and this action should be dismissed." Reply Memo at 8. In other words, because

"Plaintiffs' alleged inability to . . . engage in intimate relations with her husband . . . [is]

unrelated to whether or not Plaintiff is permitted to ride public transportation with the alleged

service animal," Defendants' Memo at 14, Plaintiff would not be entitled to the accommodation

she seeks even if she could make out a substantial limitation in the major life activity of

reproduction.

This argument is based almost exclusively on Defendants' interpretation of *Felix v. New*

*York City Transit Auth.*, 324 F.3d 102 (2d Cir. 2003). In Defendants' opinion:

> *Felix* stands for the proposition that the ADA and the RA are not
> preference statutes in the sense that a person who is ADA/RA-
> disabled, though having a substantial limitation (due to a
> recognized medical condition) in *one* major life activity, has no
> statutory right to a preference in an area – a different life activity
> (major or not) – in which the person is *not* substantially limited.

Reply Memo at 7 (footnote omitted, emphasis in original). Defendants further state that they

"cannot conceive of there being any valid authority to the contrary because the ADA and the

RA, on their face, require, for the finding of liability against a provider of a public service, some

denial of (or discrimination in the provision of) service 'by reason of' – that is, *because of* – the

person's statutory disability, the establishing of which includes a substantial limitation in some

particular recognized "major life activity." *Id*. (emphasis in original).

Although this Court recognizes that the NYCTA was a party to *Felix* and that defense

counsel, Mr. Schoolman, argued *Felix* in the Second Circuit, this Court nonetheless finds that

Defendants are misreading *Felix* and conflating "disabling condition" and the major life activity

impaired by that disabling condition. *Felix* involved a railroad clerk who witnessed the

aftermath of a token-booth firebombing in which a colleague was killed. Following this

incident, Felix developed a fear of being in the subway and insomnia and was diagnosed with

PTSD.  Felix requested reassignment to a position that would not require that she work in the subway.  The NYCTA refused, and Felix brought suit under the Title I of the ADA, which prohibits "discriminating" against an employee with a disability "because of the disability of such individual." 42 U.S.C. § 12112(a).  This statute defines "discriminate" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability, . . . unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A).

The NYCTA eventually moved for summary judgment, arguing, *inter alia*, that "there was no nexus between the major life activity impaired and the accommodation requested."  *Id*. at 104.  Felix argued that no such nexus was required, and relied on *Bragdon* "for the proposition that the ADA proscribes discrimination based on the disability of the individual rather than on the substantially impaired major life activity."  *Felix v. New York City Transit Auth*., 154 F. Supp. 2d 640, 660 (S.D.N.Y. 2001).  The district court , however, held that Felix could not invoke the protections of the ADA "because there was no nexus or causal connection between Felix's ADA-qualifying limitation and the reasonable accommodation sought . . . ."  *Id*.  The court reasoned:

> Felix's substantive limitation – the limitation that prompted the need for reasonable accommodation – was her inability to work in the subways. Felix's sleep problems, although significant, did not impair her ability to work. Nor did Felix ever request an accommodation for her sleep problems. Hence, this presents a peculiar situation – by definition, Felix was an individual with an ADA disability due to her insomnia. Yet the limitation that qualified her as a disabled person did not affect her ability to work. Felix's other limitation, her inability to work in the subways, did impair her ability to work but only in a very narrow sense. This

limitation would therefore not qualify Felix as ADA disabled. *See* discussion *supra.* This failure to allege a causal connection, or nexus, between the qualifying limitation and the accommodation requested is fatal to Felix's ADA claim. *Cf.* 9 Lex K. Larson, *Employment Discrimination* § 154.03, at 154-13 (2d ed. 2001) ("The ADA requires reasonable accommodation of the limitations, not of the disability itself."). This conclusion comports with the purpose of the ADA which is to ensure equality of treatment, not create a preference for disabled persons. *See Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir.1998) (sole intent of the ADA is to provide equal, not preferential, opportunities to disabled persons).

*Id.* at 662.

The district court specifically addressed Felix's arguments regarding *Bragdon*, a case in which an HIV-infected plaintiff sued her dentist under Title III of the ADA for refusing to fill a cavity. The district court acknowledged that *Bragdon* did not require a nexus between the alleged discrimination and the major life activity impaired – namely reproduction and the sexual dynamics surrounding it. However, the court found that *Bragdon* was "inapposite to employment-based ADA claims for a number of reasons":

> *First,* and foremost, is the fact that it is a Title III case. As such, the relevant question was whether the defendant discriminated against a disabled plaintiff by denying her the enjoyment of a place of public accommodation. *See* 42 U.S.C. § 12182(a). Thus, the Court's focus was on whether the plaintiff was statutorily disabled. The question of reasonable accommodation never arose. *Second,* the *Bragdon* decision involves HIV infection which, given its myriad of symptoms, is *sui generis.* This is apparent from the multitude of major life activities affected by HIV infection. *See* 524 U.S. at 637, 118 S.Ct. 2196 ("We have little doubt that had different parties brought the suit they would have maintained that an HIV infection imposes substantial limitations on other major life activities."). Thus, while the ability to reproduce is obviously affected, "HIV infection must be regarded as a physiological disorder with a constant and detrimental effect on the infected person's hemic and lymphatic systems from the moment of infection." *Id.* Given the panoply of symptoms, it was not a big

> leap for the Court to decide that HIV infection is an ADA
> disability for purposes of Title III.

*Felix*, 154 F. Supp. 2d at 661 (emphasis in original).

The Second Circuit affirmed the district court, but on subtly different grounds. While the Second Circuit acknowledged that the NYCTA had argued that "there was no nexus between the major life activity impaired and the accommodation requested," it nonetheless found that "the issue the district court found determinative [was]: Whether there must be a causal link between the *specific condition* which limits a major life activity and the accommodation required." *Felix*, 324 F.3d at 104 (emphasis added). The Second Circuit never specifically defined the term "condition," suggesting that the Court – which subsequently used the terms "mental condition" and "medical condition" – may have been using the term in the ordinary sense to connote a "defective state of health." *See* http://www.merriam-webster.com/dictionary/condition.

The Second Circuit then proceeded to distinguish at length between conditions which themselves constituted, or were related to, disabilities and all other conditions. The Court noted that both types of conditions could arise from "the same traumatic incident and resultant psychological disorder," but that only the former category required accommodation under the ADA. *Id*. at 105. The Court illustrated the point with a hypothetical car accident, in which a passenger loses both the ability to walk and the ability to type quickly. Since walking is a major life activity, *see* 29 C.F.R.§ 1630.2(i), the impairment to the passenger's legs would clearly be a disability. However, since the injury to the passenger's arms resulted only in an "inability to perform a single, particular job," that impairment would not substantially limit the passenger's ability to perform the major life activity of working. *See* 29 C.F.R.§ 1630.2(j)(3)(i). If the passenger were terminated from a data entry or word-processing position because of decreased

productivity, that termination would not be actionable under Title I of the ADA because that statute only prohibits "discriminating" against an employee with a disability "because of the disability of such individual." 42 U.S.C. § 12112(a).

Applying this hypothetical to Felix's case, the Second Circuit found that plaintiff had two "conditions": insomnia and fear of being in the subway. The former was a disability, because it substantially limited the major life activity of sleep. The latter was not, because it only rendered Felix unable to work in subways and, therefore, did not substantially limit the major life activity of work. The Second Circuit expressly rejected Felix's claim that her insomnia and her fear of being in the subway were part of the same singular mental disability – her PTSD – then stated:

> [I]n situations like plaintiff's where it is not clear that a single, particular medical condition is responsible for both the disability and the lesser impairment, the plaintiff must show a causal connection between the specific condition which impairs a major life activity and the accommodation. Felix has not done so here.

*Felix*, 324 F.3d at 107.

The Second Circuit then noted that its approach was consistent with the policy considerations identified by the district court, stating:

> The ADA serves the important function of ensuring that people with disabilities are given the same opportunities and are able to enjoy the same benefits as other Americans. The ADA mandates reasonable accommodation of people with disabilities in order to put them on an even playing field with the non-disabled; it does not authorize a preference for disabled people generally. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 . . . (2002). The interpretation advanced by Felix and the EEOC would transform the ADA from an act that prohibits discrimination into an act that requires treating people with disabilities better than others who are not disabled but have the same impairment for which accommodation is sought. We think that the ADA deliberately speaks in terms of eliminating discrimination and thus do not interpret it so broadly as to require the accommodation of

> impairments that do not limit major life activities whenever the
> person with an impairment happens to also have a disability.

*Id.* However, unlike the district court, the Second Circuit made no attempt to distinguish

*Bragdon*, but instead explained how this precedent dovetailed with its approach. The Second

Circuit posited that the HIV-infected plaintiff suffered from a "specific medical condition – the

risk of HIV infection." *Felix*, 342 F.3d at 106. Since this "condition" was "responsible for both

the impairment of her reproductive capacity and the dentist's unreasonable failure to

accommodate her," the failure to accommodate was "because of her disability." *Id.*

The Second Circuit also dovetailed, rather than distinguished, three cases cited by Felix.

In the first of these, *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208 (2d Cir. 2001), an

epileptic plaintiff sued her former employer, claiming, *inter alia*, that the employer's refusal to

promote her to assistant manager on the ground that she could not drive violated the ADA.

Driving is not considered a major life activity in this Circuit, *Colwell*, 158 F.3d at 643, but

Lovejoy-Wilson was unquestionably disabled by virtue of EEOC regulations that specify that

epilepsy constitutes a disability. *Lovejoy-Wilson*, 263 F.3d at 216 (citing 29 C.F.R.

1615.103(1)(ii)). The *Lovejoy-Wilson* Court did not determine which major life activity was

impaired by the epilepsy, but nonetheless reversed that portion of the district court's

determination that had denied plaintiff's failure to promote claim as a matter of law.

In addressing the NYCTA's arguments on appeal, Felix argued "that because the

impairment that affected Lovejoy-Wilson's eligibility for promotion was her inability to drive,

which was caused by her epilepsy but not part of a major life activity that epilepsy interferes

with, a causal connection between the major life activity impaired and the accommodation

requested cannot be required." *Felix*, 324 F.3d at 106. In rejecting this argument, the *Felix*

38

Court saw no need to determine if there was a causal nexus between the unspecified major life activity and the accommodation requested, or even to determine what the major life activity might be. Rather, the *Felix* Court focused solely on the condition, stating, "Lovejoy-Wilson's inability to drive is due to the same disability – periodic and sudden loss of all motor control – that qualifies her as disabled because it substantially impairs a major life activity." *Id*.

The second of the three cases cited by Felix and distinguished by the Second Circuit was *Vande Zande v. State of Wis. Dep't of Admin.*, 44 F.3d 538 (7th Cir. 1995), in which a woman paralyzed below the waist requested an accommodation for pressure ulcers. The *Felix* Court conceded that "the pressure ulcers do not directly relate to walking – the major life activity which was impaired." *Felix*, 324 F.3d 106. Yet, the *Felix* Court was untroubled by this lack of a nexus between major life activity and the requested accommodation, noting only that "the Seventh Circuit found that the ulcers were 'a characteristic manifestation of [the] disability' and thus were 'a part of the underlying disability.'" *Id.* (quoting *Vande Zande*, 44 F.3d at 544.).

The third case – *McAlindin v. County of San Diego*, 192 F.3d 1226 (9th Cir. 1999) – involved a man who suffered from anxiety disorders, panic disorders, and somatoform disorders.[10] He sued his employer alleging that the County denied him a "reasonable accommodation" in violation of the ADA when it failed to transfer him to another job, failed to give him necessary training, and disciplined him for sleeping on the job even though that was caused by his medications. Although the district court found that McAlindin was not disabled,

---

[10]"A somatoform disorder is a 'condition marked by the presence of symptoms suggesting a physical disease but without physical changes or physiological mechanisms that might account for the symptoms. In addition, there must be evidence, or a strong suggestion, that the symptoms have a psychogenic or psychologic origin.'" *McAlindin*, 192 F.3d at 1230, n. 1 (quoting J.E. Schmidt, 5 *Attorney's Dictionary of Medicine and Word Finder* at S-206 (1999)).

the Ninth Circuit reversed, holding that there was a genuine issue of material fact with respect to whether McAlindin was substantially limited in his ability to sleep, reproduce and interact with others, even if he was not substantially limited in his ability to work. The Ninth Circuit also noted that the fact that McAlindin was substantially limited in major activities unrelated to work did not preclude him from seeking a ccomodations at work, saying:

> The existence of a genuine issue of material fact regarding disability and of one regarding reasonable accommodation require separate inquiries. In the reasonable accommodation analysis, we focus on the impairment as relevant to the workplace and thus on whether the employer is making reasonable accommodations. Thus, the sleep disorder and sexual dysfunction merely help to establish that the impairment (panic disorder after treatment) affects a major life activity; they are not relevant to the reasonable accommodation discussion, however, which focuses on the post-treatment panic disorder's manifestations in the workplace and the employer's response to them.

*McAlindin*, 192 F.3d at 1237.

Again, the *Felix* Court saw no need to reject or distinguish *McAlindin*. To the contrary, the Second Circuit "agree[d] with the Ninth Circuit that a plaintiff can seek accommodation at work even if the impairment only qualifies as a disability because of a life activity other than working." *Felix*, 324 F.3d at 106. However, the Second Circuit noted that McAlindin appeared to be seeking accommodation for the same mental impairments that gave rise to his disability, while Felix was seeking accommodation for non-disability impairments. *Id.*

This Court is aware that other Circuit Courts of Appeals have cited *Felix* in support of the proposition that an ADA action does not lie unless there exists a causal connection between the major life activity that is limited and the accommodation requested. *See Wood v. Crown Redi-Mix, Inc.*, 339 F.3d 682, 687 (8th Cir. 2003). However, this Court does not read the Second Circuit's opinion as supporting this proposition. Although the NYCTA may have urged the

*Felix* Court to require a "nexus between the major life activity impaired and the accommodation requested," the question which the Second Circuit actually answered in *Felix* was "[w]hether there must be a causal link between the *specific condition* which limits a major life activity and the accommodation required." *Felix*, 324 F.3d at 104 (emphasis added). The Court answered that question in the affirmative, holding that "where it is not clear that a single, particular medical condition is responsible for both the disability and the lesser impairment, the plaintiff must show a causal connection between *the specific condition* which impairs a major life activity and the accommodation." *Id*. at 107 (emphasis added).

While one can certainly debate precisely what the *Felix* Court meant by "specific condition," that term is not synonymous with "major life activity impaired." If this were true, the *Felix* Court could not have dovetailed the decisions in *Bragdon*, *Vande Zande* and *McAlindin*. In *Bragdon*, the "major life activity impaired" was "reproduction," yet the dental services sought by Bragdon did not alleviate the limitations on her sexual activities. In *Vande Zande*, the pressure ulcers for which the plaintiff sought an accommodation did not "directly relate to walking – the major life activity which was impaired." *See Felix*, 324 F.3d at 106. Similarly, in *McAlindin*, the workplace accommodations sought were unrelated to the limitations the plaintiff was experiencing in the major life activities of sleeping and reproducing.

Finally, this Court notes that the *Felix* Court made no effort to even ascertain what "major life activities" were impaired in *Lovejoy-Wilson*. If *Felix* actually held that the ADA requires a "nexus between the major life activity impaired and the accommodation requested," one would expect that determination of that "major life activity" would be central to that Court's analysis. The fact that the *Felix* Court focused on Lovejoy-Wilson's disability, rather than

whatever "major life activities" were impaired, militates strongly against Defendants'

interpretation of the holding in *Felix*.[5]

### Service Dogs

Defendants' third argument relates to the question of whether Plaintiff's dogs are

"service animals" or "emotional support or comfort animals."  Regulations promulgated by DOT

require the NYCTA to "permit service animals to accompany individuals with disabilities in

vehicles and facilities."  49 C.F.R. § 37.167(d).  The term "service animal" is defined under

these regulations to mean:

> [A]ny guide dog, signal dog, or other animal individually trained
> to work or perform tasks for an individual with a disability,
> including, but not limited to, guiding individuals with impaired
> vision, alerting individuals with impaired hearing to intruders or
> sounds, providing minimal protection or rescue work, pulling a
> wheelchair, or fetching dropped items.

49 C.F.R. § 37.3.  Defendants argue that Plaintiff's dogs have not been "individually trained to

perform tasks or do work related to her disability" and, therefore, do not meet the definition of

"service animals."  Defendants' Memo at 14.  Defendants contend that the dogs are, in reality,

"emotional support" animals, and can be barred from riding on NYCTA vehicles.

The precise distinction between a "service animal" and an "emotional comfort" animal is

not well defined.  Indeed, the only authority cited by either party which makes any effort to draw

---

[5]There remains a question as to whether this is a case in which a causal connection
between the specific condition which impairs a major life activity and the accommodation
requested need even be shown.  *Felix* indicates that such a showing is necessary in cases in
which there is evidence of both a disability and a non-disability impairment, and it is not
"obvious" whether a single, particular medical condition is responsible for both.  *Felix*, 324 F.3d
at 107. Since the parties have not briefed this issue, this Court is not in a position to determine
this question at this juncture.

a distinction between the two types of animals is a June 17, 2008, Notice of Proposed Rulemaking ("NPRM") issued by the DOJ in connection with proposed changes to, among other things, that agency's definition of "service animals." *See* Nondiscrimination on the Basis of Disability in State and Local Gov. Svcs., 73 Fed. Reg. 34466-01, 2008 WL 2413718 (June 17, 2008). This NPRM specifically notes that "public transportation services, programs, and activities of public entities are covered by subtitle B of title II of the ADA, 42 U.S.C. 12141, . . . are not subject to the requirements" of 28 CFR part 35, but "are subject to the regulation of the Department of Transportation (DOT) at 49 CFR part 37 . . . ." *Id.*, 73 Fed. Reg. at 34467. However, Defendants themselves represent that the DOT has adopted the DOJ's interpretations applicable to ADA Title III in other contexts. Defendants' Memo at 6. Accordingly, this Court will consider the NPRM as providing guidance regarding how to draw the distinction between "service animals" and "emotional comfort animals" in this case.

The NPRM sought, *inter alia*, to amend the DOJ's regulatory language to clarify that service animals included "psychiatric service animals" that were "trained to do work or perform a task (e.g., reminding its owner to take medicine) for persons whose disability is covered by the ADA . . . ." *Id.*, 73 Fed. Reg. at 34473. The NPRM noted that under the then-existing regulatory language:

> [S]ome individuals and entities . . . assumed that the requirement that service animals must be individually trained to do work or carry out tasks excluded all persons with mental disabilities from having service animals. Others . . . assumed that any person with a psychiatric condition whose pet provided comfort to him or her was covered by the ADA.

*Id.* With respect to the first of these assumptions, the DOJ proposed modifying its assumptions to clarify its "longstanding position" that "[t]he term service animal includes individually trained

43

animals that do work or perform tasks for the benefit of individuals with disabilities, including

psychiatric, cognitive, and mental disabilities." *Id.* With respect to the second assumption, the

DOJ sought to "formalize its position on emotional support or comfort animals": that "[a]nimals

whose sole function is to provide emotional support, comfort, therapy, companionship,

therapeutic benefits, or promote emotional well-being are not service animals." *Id.*, 73 Fed. Reg.

at 34473, 34478.

In attempting to draw the distinction between "comfort animals" and "psychiatric service

animals," the DOJ provided examples of the sorts of tasks that could be performed by the latter.

The NPRM stated:

> Psychiatric service animals can be trained to perform a variety of
> tasks that assist individuals with disabilities to detect the onset of
> psychiatric episodes and ameliorate their effects. Tasks performed
> by psychiatric service animals may include reminding the handler
> to take medicine; providing safety checks, or room searches, or
> turning on lights for persons with Post Traumatic Stress Disorder;
> interrupting self-mutilation by persons with dissociative identity
> disorders; and keeping disoriented individuals from danger.

*Id.*, 73 Fed. Reg. at 34473. The definition of "service animal" which was ultimately

promulgated by the DOJ did not contain the same examples of tasks performed by a "psychiatric

service animal."[6] However, this Court does not interpret the DOJ's decision to include other

_____

[6]The final rule promulgated by DOJ defined the term "service animal" to mean:

> [A]ny dog that is individually trained to do work or perform tasks
> for the benefit of an individual with a disability, including a
> physical, sensory, psychiatric, intellectual, or other mental
> disability. Other species of animals, whether wild or domestic,
> trained or untrained, are not service animals for the purposes of
> this definition. The work or tasks performed by a service animal
> must be directly related to the handler's disability. Examples of
> work or tasks include, but are not limited to, assisting individuals
> who are blind or have low vision with navigation and other tasks,
> alerting individuals who are deaf or hard of hearing to the presence

examples in the non-exclusive list contained in the final regulation as intended to imply that any of the examples included in the NPRM were no longer valid.

In this case, Defendants acknowledge that "Plaintiff claims that her service dogs . . . are able to alert . . . her beginning to dissociate and assist her in 'staying in the present.'" Defendants' Memo at 14. Plaintiff claims, for example, that one of her dogs, Wargas, was trained to "alert [her] by pawing [her] leg" upon sensing that she was "emotionally upset." Defendants' Rule 56.1 Ex. 14, at ST07538. Plaintiff claims that the pawing "refocuses [her] and keeps [her] from dissociating" and that, as a result, she "rarely" dissociates or has flashbacks while using a service dog. *Id.* Similarly, Plaintiff claims that she "trained" all three of her dogs to "mitigate" her PTSD by ignoring her "triggers" in a way that resulted in virtually eliminating her flashbacks. *Id.*

Plaintiff claims that her dogs' actions mitigate her symptoms finds some support in a report submitted by Dr. Spencer Eth, a Professor and Vice Chairman of Psychiatry at New York Medical College, who performed a psychiatric evaluation of Plaintiff in 2007. In discussing the role of Plaintiff's dog, Wargas, Dr. Eth stated:

---

of people or sounds, providing non-violent protection or rescue work, pulling a wheelchair, assisting an individual during a seizure, alerting individuals to the presence of allergens, retrieving items such as medicine or the telephone, providing physical support and assistance with balance and stability to individuals with mobility disabilities, and helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors. The crime deterrent effects of an animal's presence and the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition.

Nondiscrimination on the Basis of Disability in State and Local Government Services, 75 Fed. Reg. 56164-01, 56177, 2008 WL 2413718 (Sept. 15, 2010) (to be codified at 28 C.F.R. § 35.104).

> Wargas has assumed critical psychological tasks, which Ms.
> Stamm relies upon to help maintain her psychiatric stability.
> Wargas is exquisitely sensitive to changes in Ms. Stamm's level of
> anxiety, such that Wargas may become aware of escalating anxiety
> before Ms. Stamm herself can appreciate the change in her mental
> state. Consequently, Ms. Stamm is better able to control the
> disruptive effects of her psychological terror.

Affidavit of Spencer Eth, M.D., dated Oct. 22, 2008, Ex. B at 5. Dr. Eth concluded that

Wargas's actions "are specific and effective, and they target psychiatric symptoms that have long

handicapped Ms. Stamm." *Id.*

This evidence may be sufficient to establish that the tasks which Ms. Stamm's dogs have

been trained to perform fit within the category of tasks "that assist individuals with disabilities to

detect the onset of psychiatric episodes and ameliorate their effects." *See* 73 Fed. Reg. at 34473.

While Defendants may be able to adduce evidence that the dogs have only received obedience

training and that it is their mere presence which results in the psychological benefits, this

evidence would only serve to create a genuine issue of material fact regarding whether Plaintiff's

dogs were "service animals." Accordingly, this Court cannot grant summary judgment on the

issue of whether Plaintiff's dogs are "service dogs."

Similarly, this Court cannot grant summary judgment based on Defendants' contention

that Plaintiff's dogs "are not 'service dogs' within the meaning of the applicable law because

their persistent aggressive conduct toward persons and dogs is incompatible with the

designation." Defendants' Memo at 15. Both the DOT and DOJ regulations quoted above

define "service animal" solely in terms of the work and tasks the animal is trained to perform.

The regulations do not limit the definition by setting behavioral criteria the animal must meet.

To the contrary, Defendants' themselves have provided this Court with a DOJ "interpretation" of

ADA Title III which provides that businesses can exclude "service animals" which are "out of control" or which pose "a direct threat to the health or safety of others." *See* Disability Rights Sec., DOJ Civil Rights Div., ADA Business Brief: Service Animals (April 2002) (Defendants' Rule 56.1 Ex. 17). Although Defendants point out that this "interpretation" is not entitled to the same deference as the regulations, this "interpretation" nonetheless implies that the "service animal" definition is broad enough to encompass dogs which are tempermentally ill-suited to the purpose. ***Plaintiff's Title II Claims***

Defendants' fourth argument, relating to whether Plaintiff has a cause of action under Title II of the ADA, actually consists of two parts. First, Defendants argue that the "occasional brief actions" by their employees, which Defendants characterize as "questioning Plaintiff about her (very large) animal," do not give rise to a Title II cause of action against Defendants. Defendants' Memo at 16. Defendants argue (1) that the employees who have questioned Plaintiff regarding her dogs are acting contrary to defendants' rules and training; (2) that occasional delays resulting from the operator's actions have been brief; and (3) that Defendants have promptly reinstructed employees and rectified problems when plaintiff has adequately reported them. *Id*. Defendants note that Plaintiff has been given direct access to its Department of Buses Command Center – or "Console" – from which she can, and has, obtained immediate intervention when she encounters a challenge. *Id*. at 17. In addition, defendants allege that they now discuss their service animal policy during formal training programs, and use "a variety of formats" to remind employees of the policy. *Id*.

Second, Defendants argue that Plaintiff's claim for compensatory damages must fail because plaintiff has neither alleged nor established intentional discrimination on the part of the

NYCTA.  *Id.* at 17-18.  In so arguing, Defendants principally rely on *Stewart v. New York City Transit Auth.*, No. 03 Civ. 10329 (RWS), 2006 WL 270100 (S.D.N.Y. Feb. 6, 2006), for the proposition that "[i]n order to obtain compensatory damages for a Title II violation, a plaintiff must demonstrate intentional discrimination on the part of the government agency involved." Defendants' Memo at 17-18.  Defendants allege that they have "undertaken extraordinary efforts to assist Plaintiff with her perceived violations of the ADA," and that Plaintiff has not even alleged deliberate violation of Plaintiff's rights by Defendants' employees.  *Id.*

In responding to the first part of Defendants' fourth argument, Plaintiff principally argues that "[a]t minimum, factual disputes exist concerning the extent to which defendants train their employees, the content of the alleged training, and the efficacy of that alleged training." Plaintiff's Memo at 19.  Plaintiff specifically denies that the incidents involving violations of the NYCTA's own rules regarding service animals are isolated and sporadic, and points to evidence of over 50 incidents spanning the period between mid-November 1998 and February 2008.  *See* Plaintiff's Counterstatement of Material Facts at ¶¶ 174-280 (citing and quoting evidence). Plaintiff distinguishes various district court cases cited by Defendants on the ground that they involved only isolated incidents, and seeks to analogize this case to *Camarillo v. Carrols Corp.*, 518 F.3d 153 (2d Cir. 2008), which Plaintiff characterizes as "controlling."  Plaintiff's Memo at 20.

While *Camarillo* may not actually be controlling, the reasoning of the Second Circuit is applicable to this case.  *Camarillo* was a Title III action, brought by a legally blind woman who was unable to read the menu boards at fast-food restaurants.  Although Camarillo was able to read menus printed in a large typeface if she could hold them directly in front of her face, none

of the fast-food restaurants she frequented had such menus.  When she asked the employees

manning the counter to read the menu to her, they often read only part of the menu and

sometimes either refused to comply or refused to do so until every other patron was served.

*Camarillo*, 518 F.3d at 155.  When Camarillo sued the restaurants under Title III of the ADA,

the district court granted the defendants' motion to dismiss, holding that she had "not alleged

that she was denied use and enjoyment of the services provided at defendants' restaurants."

*Camarillo v. Carrols Corp.*, No. 1:05-CV-1365, 2006 WL 2795238, at *3 (N.D.N.Y. Sept. 25,

2006).  Noting that Camarillo's complaint conceded that employees at the restaurants "were

willing and able to read her the menus," and that she was invariably "permitted to eat," the

district court concluded that Camarillo had "not alleged a single instance when she was deprived

of the services enjoyed by other patrons . . . ."  *Id.*

The Second Circuit reversed, noting that Title III requires owners of public

accommodations "to take such steps as may be necessary to *ensure* that no individual with a

disability is excluded, denied services, segregated or *otherwise treated differently* than other

individuals because of the absence of auxiliary aids and services."  *Camarillo*, 518 F.3d at 157

(quoting 42 U.S.C. § 12182(b)(2)(A)(iii)) (emphases in *Camarillo*).  Quoting *Stan v. Wal-Mart

Stores, Inc.*, 111 F. Supp. 2d 119, 127 (N.D.N.Y. 2000), for the proposition that this provision

required owners of public accommodations to "ensure that they adopt the proper policies and

procedures to train their employees on dealing with disabled individuals and make reasonable

efforts to ensure that those policies and procedures are properly carried out and enforced," the

Second Circuit reasoned that Camarillo's allegations that the restaurants had repeatedly failed to

"effectively communicate" menu options, as required by 28 C.F.R. § 36.303(c), was sufficient to

give rise to a reasonable inference of a failure to train. *Camarillo*, 518 F.3d at 157. The Court

stated:

> Camarillo alleges more than mere rudeness or insensitivity, and
> more than one or two isolated mistakes. Rather, a reasonable
> inference to be drawn from her complaint is that defendants failed
> to adopt policies or procedures to effectively train their employees
> how to deal with disabled individuals. Such a failure to train can
> constitute a violation of the ADA.

*Id.*

Although *Camarillo* involved a Title III claim, this Court notes that Title II also requires

that employees of covered entities be trained. Although the statutory language of Title II, Part B,

which mandates that public transportation be "accessible" to people with disabilities, does not

specifically refer to training, it directs the Secretary of Transportation to "issue regulations . . .

necessary for carrying out" that mandate. 42 U.S.C. § 12164. Pursuant to that directive, the

DOT promulgated 49 C.F.R. Part 37, which includes specific "service requirements," including a

requirement that covered entities "permit service animals to accompany individuals with

disabilities in vehicles and facilities." 49 C.F.R. § 37.167(d). Part 37 also requires that:

> Each public or private entity which operates a fixed route or
> demand responsive system shall *ensure* that personnel are *trained*
> *to proficiency*, as appropriate to their duties, so that they operate
> vehicles and equipment safely and properly assist and treat
> individuals with disabilities who use the service in a respectful and
> courteous way, with appropriate attention to the difference among
> individuals with disabilities.

49 C.F.R. § 37.173 (emphasis added).

In arguing that Plaintiff has not made out a Title II violation in this case, Defendants have

adduced evidence concerning their efforts to train their employees regarding the DOT's

regulations and other requirements for dealing with persons with disabilities. However, even

assuming that this evidence were uncontroverted, it still would not establish that Defendants' efforts have succeeded in training the employees to proficiency. Indeed, Plaintiff has adduced evidence of numerous recorded conversations between bus operators and their supervisors in which the former – and sometimes even the latter – evince ignorance of the NYCTA's own rules regarding service dogs. *See*, *e.g*., Affidavit of Bruce J. Turkle, Esq. ("Turkle Aff."), Ex. BB, pp. 1-2, 9, 12, 18, and 29; Ex. CC; and Ex. DD. These conversations alone might permit a fact-finder to draw the "reasonable inference . . . that [D]efendants failed to adopt policies or procedures to effectively train their employees how to deal with disabled individuals." *See Camarillo*, 518 F.3d at 157.

However, Plaintiff in this case, unlike Camarillo, is not relying solely on circumstantial evidence of a failure to train. Plaintiff has provided the Court with deposition testimony in which the NYCTA's ADA Officer acknowledges that the NYCTA has the "responsibility to train employees and to make sure that employees understand" the policies regarding service animals, but states that "many of them don't." Deposition of John Gaito, Jr., dated May 24, 2007 (Ex. J to Turkle Aff.), at 24. That statement is amply corroborated by the deposition testimony of various NYCTA employees – including Carl Bonsignore, a Superintendent of Transportation, and Harry Caddell, a General Superintendent in charge of bus drivers – indicating that they received little, if any, training regarding service animals. *See*, *e.g,*, Deposition of Harry Caddell, dated May 14, 2007 (Ex. M to Turkle Aff.), at 25 (stating that he could not recall receiving any ADA-training in preceding 10 years); Deposition of Carl Bonsignore, dated May 23, 2007 (Ex. N to Turkle Aff.), at 25 (testifying that he did not "recall seeing" any guidance on service animals that assist individuals with mental disabilities); Deposition of Ernest Sanchez, dated

May 10, 2007 (Ex. P to Turkle Aff.), at 14 (testifying that, although he had been a bus operator

for 18 years, he could not recall any announcements or publications relating to change in

Defendants' service animal policies).  This testimony, together with the circumstantial evidence

described above, is sufficient to create a genuine issue of material fact regarding whether

Defendants adequately trained their employees.

While this Court cannot grant summary judgment with respect to the first part of

Defendants' fourth argument, this Court recognizes that Defendants fourth argument contains a

second issue, relating to whether Plaintiff can recover compensatory damages from Defendants

for the ADA violation.  Defendants assert that "Compensatory damages under [the] ADA require

a showing of deliberate intent to discriminate."  Defendants' Memo at 17.  However, this

assertion is not immediately followed by any citations.  Instead, Defendants devote the

remainder of the paragraph to characterizing the facts as showing, "at worst, occasional rude or

ignorant conduct by a few non-supervisory and non-managerial employees," and Defendants'

"extraordinary efforts to assist Plaintiff."  *Id*.

The next paragraph begins by citing to some authorities, but these do not directly support

the proposition that a showing of "deliberate intent to discriminate" is necessary.  This paragraph

states, in pertinent part:

> The absence of a basis for compensatory damages in this case is
> supported by court decisions involving similar ADA Title II
> claims.  *See Stewart v. New York City Transit Authority*, 2006 U.S.
> Dist. LEXIS 4279, *23 (S.D.N.Y. Feb. 6, 2006) ("In order to
> obtain compensatory damages for a Title II violation, a plaintiff
> must demonstrate intentional discrimination on the part of the
> government agency involved . . . .  Here, [in failure to make bus
> announcements required under the DOT regulations], there is no
> evidence of discriminatory animus or ill will by the TA or by the
> [Department of Buses].") , citing *Midgett v. Tri-County*

> *Metropolitan Transportation District of Oregon*, 254 F.3d 846 (9th
> Cir. 2001) and *Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th
> Cir. 1998); *see also Dorsett v. SEPTA*, 2005 U.S. Dist. LEXIS
> 18351, *15-16 (E.D. Pa. Aug. 19, 2005).

*Id.* at 17-18 (brackets in original)

Although Defendants correctly quote *Stewart*, their decision to cite *Midgett* and *Ferguson* following – rather than within – the parenthetical and to omit citation to *Garcia v. S.U.N.Y. Health Sciences Ctr.*, 280 F.3d 98 (2d Cir. 2001), altogether, renders the above-quoted passage confusing.  In fact, *Stewart* cited *Midgett* and *Ferguson* only for the proposition that showing of "intentional discrimination" is necessary to collect compensatory damages for a Title II violation.  *Stewart*, 2006 WL 270100, at *8.  However, *Stewart* relied exclusively on *Garcia* for the proposition that "in order to demonstrate intentional discrimination under Title II, a plaintiff must show not only a violation, but also that it was motivated by either discriminatory animus or by ill will stemming from a plaintiff's disability." *Id*. at *9.  *Stewart* then applied the *Garcia* standard, holding that the plaintiff had not adduced evidence of the requisite "discriminatory animus or ill will . . . ."  *Id*. at *9.

The confusion is compounded by the fact that *Stewart* itself is a problematic opinion. This Court has no difficulty regarding that portion of *Stewart* which held that a showing of discriminatory intent is required to obtain money damages for a Title II violation.  Although *Stewart* cited only to *Ferguson* – the Ninth Circuit opinion which first enunciated the "discriminatory intent" requirement – and authorities from other circuits,[7] the Second Circuit has also adopted this requirement.  *See Bartlett v. New York State Bd. of Law Examiners*, 156 F.3d

---

[7]*Stewart* cites to *Midgett*; *Wood v. President & Trustees of Spring Hill College*, 978 F.2d 1214, 1219-20 (11th Cir.1992); and *Douris v. Bucks County*, No. 03 Civ. 5661(RBS), 2004 U.S. Dist. LEXIS 12769, at *15 (E.D. Pa. July 6, 2004), *aff'd*, 2005 U.S.App. LEXIS 17269 (3d Cir. Aug. 16, 2005)(summary order).

321, 331 (2d Cir. 1998), *vacated on other grounds*, 527 U.S. 1031 (1999). However, this Court does not agree with that portion of *Stewart* that suggests that a showing of "discriminatory animus or ill will" is necessary to make out "intentional discrimination." To the contrary, the Second Circuit has expressly held that "a plaintiff may recover money damages under either Title II of the ADA or § 504 of the Rehabilitation Act upon a showing of a statutory violation resulting from 'deliberate indifference' to the rights secured the disabled by the acts." *Garcia*, 280 F.3d at 115 (quoting Bartlett, 156 F.3d at 331). Proof of discriminatory animus or ill will is required only for "damage claims brought against states." *Id*.

The fact that *Stewart* applied the "discriminatory animus or ill will" standard in a case in which the only defendant was the NYCTA creates yet another layer of confusion. The "discriminatory animus or ill will" standard was first enunciated in *Garcia*, a 2001 case in which the Second Circuit grappled with the interplay between Title II and the Eleventh Amendment of the United States Constitution. *Stewart* cites to *Garcia*, but does not expressly determine that the NYCTA is a state entity covered by the Eleventh Amendment or engage in the six-factor analysis necessary to make this determination. See *Mancuso v. N.Y. State Thruway Auth*., 86

F.3d 289, 293 (2d Cir. 1996).[8]  Accordingly, although *Stewart* implicitly holds that NYCTA is an arm of the state, it is unclear whether *Stewart* intended to make this determination.

All of this confusion makes it difficult to analyze the second part of Defendants' fourth argument.  It is not even clear what standard Defendants are advocating.  They principally rely on *Stewart*, which can be read for the proposition that the "discriminatory animus or ill will" standard should apply to cases involving the NYCTA.  However, Defendants also expressly state that "[c]ompensatory damages under ADA require a showing of deliberate intent to discriminate," Defendants' Memo at 17, suggesting that Defendants may be arguing for the lesser, "deliberate indifference" or "discriminatory intent" standards.  This Court cannot infer the standard from Defendants' attempt to apply the law to the facts, since this portion of Defendants' Memo consists of two sentences, characterizing the facts as showing, "at worst, occasional rude or ignorant conduct by a few non-supervisory and non-managerial employees," and Defendants' "extraordinary efforts to assist Plaintiff."  *Id*.  Moreover, Plaintiff has not even addressed this argument.

---

[8]In *Mancuso*, the Second Circuit described six factors that should be considered when evaluating whether a particular entity is an arm of the state and thus immune:  (1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state.  Although this Court is aware of cases applying the *Mancuso* analysis to public benefit corporations similar to Defendants, *see A. Esteban & Co., Inc. v. Metropolitan Transp. Auth*., No. 02 Civ. 3615 (NRB), 2004 WL 439505, at *4-6 (S.D.N.Y. Mar. 9, 2004)(holding that the Metropolitan Transportation Authority is not immune under the Eleventh Amendment), this Court is unaware of any case expressly deciding whether Defendants NYCTA and MaBSTOA are state entities covered by the Eleventh Amendment.

In light of the foregoing, this Court cannot address this argument on the papers presented. Yet, this Court cannot simply ignore this argument since it may determine whether Plaintiff can recover money damages from Defendants in this action. Accordingly, this Court will direct the parties to submit supplemental briefing on this issue. The parties are directed to confer and to submit a proposed briefing schedule to the Court on or before April 15, 2011.

### State Claims

Defendants' fifth and final argument seeks to dismiss some of Plaintiff's claims under state and local laws. Defendants primarily argue that the evidence adduced by Plaintiff does not support her claim of intentional infliction of emotional distress because it does not establish "conduct . . . so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Defendants' Memo at 21 (quoting *Dillon v. City of New York*, 261 A.D.2d 34, 41 (N.Y. App. Div. 1st Dep't 1999)). Defendants also argue that claims of "intentional infliction of emotional distress against government bodies are barred as a matter of public policy . . . ." Defendants' Memo at 21-22 (quoting *Dillon*, 261 A.D.2d at 41). Plaintiff responds by arguing that the record demonstrates "more than 50 documented instances of unlawful discrimination, the reckless nature of defendants' conduct, a connection between defendants' outrageous conduct and the resulting injury, and plaintiff's severe emotional distress." Plaintiff's Memo at 23.

"Under New York law, a claim for intentional infliction of emotional distress requires a showing of (1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." *Sluto v. Fleishman*, 164 F.3d 820,

827 (2d Cir. 1999) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)). As the

New York Court of Appeals has observed, "[i]n practice, courts have tended to focus on the

outrageousness element, the one most susceptible to determination as a matter of law." *Howell*,

81 N.Y.2d at 121.[9] To establish this element, a plaintiff must show that the defendant's conduct

was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds

of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Sluto*,

164 F.3d at 827 (quoting *Howell*, 81 N.Y.2d at 122). The New York Court of Appeals has

described this standard as "strict," *Murphy v. American Home Products Corp.*, 58 N.Y.2d 293,

303 (1983), "rigorous, and difficult to satisfy." *Howell*, 81 N.Y.2d at 122 (quoting Prosser and

Keeton, Torts § 12, at 60-61 [5th ed]). Indeed, in its 1993 opinion in *Howell*, the New York

Court of Appeals noted that "of the intentional infliction of emotional distress claims considered

by [that] Court, every one has failed because the alleged conduct was not sufficiently

outrageous." *Id*. at 121.

Defendants' conduct in this case does not come close to meeting this strict standard.

Defendants' efforts to train their workers may not have been effective, but there is ample,

undisputed evidence that they have made substantial efforts. Moreover, Defendants have not

callously disregarded the possibility that these efforts might not be successful, but have taken the

extraordinary step of providing Plaintiff with the Bus Command Center's telephone number, so

that supervisors can promptly rectify problems that occur. Indeed, Plaintiff has used that number

---

[9]As the Second Circuit has noted, "[o]rdinarily, whether the challenged conduct is
sufficiently outrageous will be determined as a matter of law." *Rizzo v. Edison, Inc*., 172 Fed.
Appx. 391, 396 (2d Cir. 2006)(summary order)(quoting *Nevin v. Citibank, N.A.*, 107 F. Supp. 2d
333, 345-46 (S.D.N.Y. 2000)).

on many occasions.  The transcripts of Plaintiff's conversations with Console, along with the letters written by Mr. Seay and other NYCTA employees in response to Plaintiff's written complaints, indicate that Plaintiff has usually received prompt and courteous attention to her complaints.

To be sure, some of the bus operators and subway conductors Plaintiff has encountered have not been so courteous.  However, no reasonable fact-finder could conclude that their actions go  "beyond all possible bounds of decency," can objectively be viewed as "atrocious," or are "utterly intolerable in a civilized society."  *See Sluto*, 164 F.3d at 827; *Howell*, 81 N.Y.2d at 122.  These low-level employees are faced with the conflicting demands posed by a rule which, at times, has either required, or been interpreted as requiring, that they admit any dog whose owner represents that it is a service dog and a policy which requires they exclude pets. They alone have to make an almost instant determination of whether a dog is a trained service animal or a pet which might pose a potential threat to passengers.  Failing to make the correct determination could have serious, even fatal, consequences.

In cases such as this, in which a passenger with no apparent disability is accompanied by a large dog, that decision is not only more difficult, but potentially more consequential.  A passenger may assure them that the dog is a "service animal," but there is no assurance that the passenger is being truthful or that the dog is adequately trained.  Given the Hobson's choice facing these employees, it is entirely understandable that bus operators and subway conductors would want identification to prove the dog's status.  Indeed, the NYCTA issues such identifications, and Plaintiff has one.

Plaintiff may not be required to have or to show that identification. However, if she elects not to, Plaintiff can reasonably expect that not all NYCTA personnel will automatically credit her representation and will inquire further. Even if some bus operators' and subway conductors' actions fall afoul of the rules, whether through ignorance or for other reasons, their actions cannot be reasonably construed as indecent, atrocious or intolerable. Indeed, this Court suspects that most lay jurors would find the policy and regulations which prohibit NYCTA employees from asking for identification, and Plaintiff's refusal to produce the identification she already has, to be more unreasonable than the actions of these bus operators and subway conductors.

### Additional Claims

Plaintiff perceives Defendants' Memo as raising or suggesting two additional claims. First, Plaintiff notes that the "Preliminary Statement" of Defendants' Memo argues that Plaintiff's retaliation claim should be dismissed, but that no such argument appears in the Discussion. Plaintiff's Memo at 22-23. Second, Plaintiff views Defendants' fifth argument as seeking to dismiss Plaintiff's Claims under the New York State and New York City Human Rights Law. *Id*. at 24.

This Court agrees that Plaintiffs' "Preliminary Statement" contains arguments that are not mentioned subsequently. In fact, these arguments relate not only to Plaintiff's retaliation claims, but also to whether some of Plaintiff's ADA, Rehabilitation Act, and state and local claims are time-barred. Since these arguments may have merit and since this Court is ordering supplemental briefing, this Court will permit Defendants to expand on these arguments in their supplemental submissions.

On the other hand, this Court does not perceive Defendants' fifth argument as including any meritorious arguments relating to Plaintiff's state and local claims. First, Defendants assert that "there is authority for a requirement under state law that the [service] animal must perform 'tasks,'" and argue that "Plaintiff's claims under State and City Human Rights Laws should . . . be dismissed because her alleged service dog does not perform tasks . . . ." Defendants' Memo at 21. However, this Court has already determined that Plaintiff's evidence is sufficient to raise a genuine issue of material fact regarding whether Plaintiff's dogs perform tasks. *See* pp. 46-47, *ante*. Accordingly, this Court could not grant summary judgment on this issue.

Second, Defendants assert that "the meaning of service animal and who is entitled to use service animals is not well-established under New York State law," and that "open issues of state and local law may make it advisable for the Court to decline to retain jurisdiction upon dismissal of the federal claims." Defendants' Memo at 21. However, this Court is not dismissing all federal claims and Defendants do not suggest any reason or basis for declining to exercise jurisdiction over the pendent state claims under these circumstances.

### CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is granted only with respect to that portion of the eleventh cause of action which alleges intentional infliction of emotional distress. The parties are directed to submit supplemental briefing on the question of what showing Plaintiff must make in order to collect money damages under Title II of the ADA and whether Plaintiff can make that showing upon the evidence adduced. In their supplemental brief, Defendants may also elect to expand upon those arguments – referenced in the "Preliminary Statement" of Defendants' Memo but not included in the Discussion portion –

relating to Plaintiff's retaliation claim and to the question of whether some of Plaintiff's ADA, Rehabilitation Act, and state and local claims are time-barred.

The parties are directed to confer and to submit a proposed briefing schedule to the Court on or before April 15, 2011. Defendants' motion for summary judgment is denied with respect to all issues other than those mentioned in the preceding paragraph.

**SO ORDERED.**

_____/s/_____
SANDRA L. TOWNES
United States District Judge

Dated: March 30, 2011
      Brooklyn, New York